Speer, District Judge.
Under certain provisions of title 26 of the Revised Statutes, the circuit judge, upon proper application, is empowered to appoint and commission supervisors to guard and scrutinize elections. Under section 2014 of the Revised Statutes, whenever the *255 circuit judge is unable to perform this duty, be is required “to select and assign to the performance thereof, in his place, such one of the district courts within his circuit as he deems best; and, upon such selection and assignment being made, the district judge so designated shall perform and discharge, in the place of the circuit judge, all the duties, powers, and obligations imposed and conferred upon the circuit court by the provisions hereof.5’ In pursuance of the powers above stated, the presiding judge of tbe district court of this the southern district of Georgia has been selected and assigned by the Honorable f Jon A. Pardee, circuit judge of this circuit, to appoint and commission supervisors for the southern district of Georgia, in localities where applications have been properly presented, to guard and scrutinize the election for representatives in congress, to bo held on November 8, 1892. Among others, applications have been presented for the counties of Richmond and Wilkinson, in the southern district of Georgia and in the tenth congressional district of the state.
Having been apprised that'applications for the appointment of supervisors, for the counties of Richmond and Wilkinson, would be presented, and that the court would bo opened by the presiding judge of this district for election purposes, in obedience to the directions of the statute, the Young Men’s Democratic League of Richmond county, by its president and by a committee, have made application to bo heard in opposition to the appointment of supervisors for the two counties specified. The court having, in pursuance of their request, indicated that it would consider such suggestions in writing against the appointment as the representatives of that body might bo pleased to submit, the objections following have been submitted:
“As a committee, we very carefully examined the United States Revised Statutes, and have arrived at the conclusion that the petitions for supervisors in Richmond county and Wilkinson county were too late, and did not comply with the law as laid down in sections 2011-2020. Supervisors are appointed (1) for elections alone; or (2) for registration and election. In the first case they are not only to see ballots cast, they must also see thorn counted; but supervisors would not be appointed to count ballots if they had not previously been required to see them cast. In like maimer we think that in those cases where registration precedes voting, as voting precedes counting, the registration must be supervised as an integral part of the election, or, at least, that without which an election could not bo had. Illegal registration so infects tlie result that, if supervisors are to be appointed, it must be done in time for them to view that which is essential to the deposit of the legal ballots. Hence the law makes it the duty of supervisors, where registration is necessary, to attend at all times and places appointed for registration, to challenge persons offering to register, to attend at all times and places where names of registered voters may be marked for challenge, to personally inspect and scrutinize such registry for purposes of identification, to affix their signature to each page of the original list. It seems to contemplate that thereby they have acquired some knowledge of the qualifications of voters, and makes it their duty to challenge persons whose qualifications they doubt. They are directed on the day of registration to post themselves in such manner as will best conduce to their scrutinizing the manner in whicli registration is being done. All the way through the statute seems to treat registration as *256 part of the election, as much requiring supervision as the mere act of voting itself. We think this is very clearly shown in § 2011, which provides: ‘ The judge, within not less than ten days prior to the registration, if one there be, or, if no registration be required, within not less than ten days prior to the election, shall open the circuit court.’ By the act of 1877 a registration is required for Richmond county. By the acts of 1885 one is required for Wilkinson county, and our position is that, the registration books being now closed, and no application having been made ten days prior to the registration, it is now too late for supervisors to be appointed. ” "
After the careful consideration of the views of the committee which the high character of its members, all of whom are distinguished members of the bar of this court, would naturally occasion, we find it impossible to assent to their conclusions. Section 2011 of the Revised Statutes provides that “whenever, in any city or town having upward of twenty thousand inhabitants, there are two citizens thereof, or whenever, in any county or parish in any congressional district, there are ten citizens thereof, of good standing, who, prior to any registration of voters for an election for representatives or delegates in the congress of the United States, or prior to any election at which a representative or delegate in congress is to be voted for, may make known in writing to the judge of the circuit court of the United States * * * their desire to have such registration or such election, or both, guarded and scrutinized, the judge, within not less than ten days prior to the registration, if one there be, or if no registration be required, within not less than ten days prior to the election, shall open the circuit court at the most convenient point in the circuit.” Sectjon 2012 provides: “The court, when so opened by the judge, shall proceed to appoint and commission, from day to day and from time to time.” etc. It will be perceived at a glance that, by the statute, the appointment of supervisors is authorized to guard and scrutinize the registration, if there be a registration, or the election, or both, as the applicants may desire. The language of the statute must bear the construction which its words clearly import. If the application is to have the registration scrutinized, the court must be open 10 days before the registration; if it is intended to guard and scrutinize the election, 10 days before the election. The statute does not, in our opinion, make it obligatory upon the supervisors to scrutinize the registration, unless the application is for that purpose. The opposite construction would nullify the option given the applicants, to make known to the court their desire “to have such registration or such election, or both, guarded and scrutinized.”
The representatives of the Young Men’s Democratic League, of course, rely naturally upon the concluding clause of the statute, to wit: “The judge, within not less than ten days prior to the registration, if one there be, or, if no registration be required, within not less than ten days prior to the election, shall open the circuit court at the most convenient point in the circuit.” But this clause is merely directory of the time in which the court shall be open for election purposes, and neither confers nor denies nor limits the power to appoint supervisors. Indeed, section 2013 of the Revised Statutes, in the same title, provides that the powers and *257 jurisdiction conferred by the several sections in point shall be exercised as well in vacation as in term time, and the judge sitting at chambers shall have the same powers and jurisdiction. In other words, the jurisdiction of the court .to appoint is in no sense modified by the direction to open the court for 10 days, at a convenient place in the circuit; a direction, of course, merely intended to further the convenience of applicants. If, however, the construction of this statute, as above expressed, is erroneous, is it, even then, true that the supervisors must ho denied because of the registration enactments cited? It will ho, of course, conceded on all hands that in general the valid laws of the state determine the qualifications of the voter whether at a local election or for presidential electors or representatives in congress; provided, always, that the state laws do not prescribe qualifications which are inhibited by the federal constitution and the statutes made in pursuance thereof. Minor v. Happersett, 21 Wall. 163. It is important to inquire, in this connection, what are the qualifications of voters, as defined by the constitution of the state? The constitution of 1877, art. 2, § 1, provides. “ Every male citizen of the United States, (except as hereinafter provided,") 21 years of age, who shall have resided in this state one year next preceding the election, and shall have resided six months in the county in which he offers to vote, and shall have paid all taxes which may hereafter be required of him, and which he may have had an opportunity of paying, agreeably to law, except for the year of the election, shall be deemed an elector.” The exceptions referred to in this clause enumerate soldier.- and sailors of the United States, residing temporarily in the state on duty, and persons convicted of treason against the state, embezzlement of public money, malfeasance in office, bribery or larceny, or any crime Involving moral turpitude, punishable by the laws of the state with imprisonment in the penitentiary, unless such person shall have been pardoned, and idiots and insane persons. The provisions of the constitution of Georgia define the qualifications of voters at elections for presidential electors and for representatives in congress.
Lt is important next to consider the provisions of the state constitution with relation to the registration of voters. Article 2, § 2, of the same constitution provides that “thegeneral assembly may provide from time to time for the registration of all electors'.” It follows, thou, that it is within the power of the general assembly of Georgia to “require” (to use the word of section 2011 of the Revised Statutes) a registration of voters for an election for representative in the congress of the United Blates or for presidential electors. This registration would be, of course, operative upon all the voters in the state at such elections. This is not, only the right of the slate, but it is expressly recognized by the federal law7. The grave matter for consideration is, has the state of Georgia required a registration of all voters at elections for presidential electors and representatives in congress? Are the local registration enactments prescribed for the various counties of the state, which are practically as varying as they are numerous, such a registration law as will relate to such elections? Are such registration laws for particular counties, and *258 differing among themselves in a multitude of material features, in consonance with the constitution of Georgia, and the constitution and laws of the United States?
Article 1, § 4, of the Georgia constitution of 1877, provides: “ Laws of a general' nature shall have uniform operation throughout the state, and no special law shall be enacted in any case for which provision has been made by an existing general law.” Now, the existing general law at that time empowered “any qualified voter for members of the general assembly to vote for an}*- candidate, or upon any question which is submitted to all the voters of the state, in any county in the state, and for any candidate or question which is submitted to all the voters of any district or circuit, in any countj' of the circuit or district in which is embraced the county of the voter’s residence.” Code, § 1278. If this provision, which was enacted under the constitution of 1868, then of force, is applied to registration, does it not follow that the legislature is inhibited, by article 1, §4, above quoted, from enacting registration laws for one county in a congressional district differing from the registration laws in the other counties of the same district? Does it not further inhibit the legislature from enacting registration laws, to affect a general election like that for presidential electors or representatives in congress,' for particular counties in a congressional district, when it fails or refuses to enact a uniform law for the same territory; and, moreover, does it not inhibit the enactment of any registration law affecting the qualification of voters at the general elections, unless the law' is of uniform operation throughout the state? The provision of the constitution that “the general assembly may provide from time for the registration 'of all electors” does not afford any foundation for a statute which denies to the voter at a general election in one county the privileges and immunities which a voter at the same election in another county enjoys. There is nothing-in the clause which authorizes the enactment of registration laws, with different requirements for. different divisions of the state, to affect voters at a general election, in which the people of the whole state are equally interested. Of course, those views w'ould have no application to a municipal election. In the case of McMahon v. Mayor, etc., 66 Ga. 217, the supreme court of the state, W'hile holding that an ordinance of the city of Savannah prescribing registration of voters in municipal elections for that city was not contrary to the constitution, used the following language: “We cannot see how the registration acts of the city may not be consistent with the power granted the legislature to pass a general law on the subject o’f registration, as contained in the constitution.” It will be observed that the court was construing a municipal registration act, and to this its language was of course restricted; but the sentence quoted may also be regarded as a judicial declaration that the pow'er granted the legislature by the constitution to pass a registration law for all voters imported a general law. The words “registration law for all voters” make this conclusion irresistible.
It will require but a cursory examination of the registration enactments made by the general assembly of Georgia, since the adoption of *259 the constitution of 1877, for various counties of the state, to perceive how totally wanting in uniformity they are, and how irregular and unfair would be their application to an election in which all the people were equally interested.
The act of December 27,1890, for Pierce county, makes the tax receiver the registrar, and requires him to close his registration on August 5th of each year. He must require the voters seeking registration to make oath as to the payment of their taxes, etc. The act expressly provides that no person can vote in any election for governor, members of the general assembly, or members of congress or presidential electors, who has not registered. It will be observed that, under the construction placed by the objectors on section 2011, in order to have supervisors in Pierce county, the United States court must be opened 10 days before the 5th of August.
The acts of December 27, 1890, and August 81, 1891, for Appling county, make the tax receiver the registrar, and require that he shall register the voters while making his regular rounds as tax receiver, from April 1st to July 1st of each year. Appling and Pierce are in the same federal judicial district, and the objections filed, if applicable at all, will open the court for election purposes 10 days before the 1st of April, and as, by the succeeding section, the court must remain open until the election in November.
The act of September 1, 1891, makes the justices of the peace registrars for Chattooga county. The registration books must be kept open from the 1st Monday in July until three days previous to the election. No person whose name is absent from this list will be permitted to vote. There is no requirement in this act for the oath as to the payment of taxes, and, if the justice of the peace is of the opinion (upon what evidence the statute is net specific) that the person is a qualified voter, he can register him, even though he be not present.
The registration act of Floyd county is even more complicated. It prescribes different regulations for different districts in the same county. It allows no one to vote who is not on the registration list. It provides that where a person has been registered, another may make affidavit charging the registry to have been improper, have a copy left at the usual place of abode of the person whose registration is attacked, and, even though that person be absent from home, unless he appear and answer the charges, or some one appears for him, he is stricken from the registration list.
The act of August 11, 1891, for Baldwin county, makes the tax collector registrar. The registration books must be opened on the same day when the books for the collection of state and county taxes are opened, and closed on the day when they are closed, and the citizen must make oath that he has paid his taxes. No person is permitted to vote whose name is not on the registry.
The act of November 7, 1889, for Wilkinson county, makes the justices of the peace registrars. All voters in the county are required to be registered under the act. Registration is to be made only every other year, *260 beginning in 1890. The registration books are to be open during the three months ending fifteen days before the election for members of the general assembly. On five days’ notice, left at the place of abode of any person who has registered, the commissioners of roads and revenues, who, it will be observed, are not the registrars, may strike such person’s name from the registry list if he fails to appear and make satisfactory answer. Only voters who are qualified at the time of the registry, under the constitution and laws of Georgia, can be registered. No provision is made for allowing the citizen to make oath as to his qualifications, but he is required by the act to produce receipts or other satisfactory proof of the payment of all taxes chargeable against him, that he has had an opportunity of paying. No provision is made for persons arriving at the voting age after the closing of the books for registry and before the election, or for persons residing in the county for six -months, but who have removed into the county from other sections of the state, after the registration books are closed. And jret the act provides that no person not registered on the list for the county .shall vote. Penalties are prescribed for any person registering unlawfully, but the act imposes no penalty for a person voting, or attempting to vote, who has not registered, and yet in other counties this is punishable by indictment.
The registration act for Warren county provides that any person who has lived in the county for six months, and who has moved into the county since the closing of the registration, and who is otherwise qualified, may register up to the day of the election.
The act of December 27, 1890, for Bibb county, provides for the registration of voters up to within 15 days before the election, who were providentially hindered from registering, who have since moved into the county, or reached their majority. This act has been declared unconstitutional, on other grounds, by a superior court of the state.
It is, perhaps, unnecessary'to call further attention to the vaiyiñg and inconsistent provisions of other registration enactments. The illustrations given above will be sufficient to show that the registration is not only not uniform, but that it has the most far-reaching, irregular, and generally unfair results upon the exercise of the elective franchise in the different portions of the state. It may be added, however, that in some counties, a minor who will attain his majority by the time of the election is required to register while he is a minor to entitle him to'vote at the election. In other counties there are no such requirements, and he can vote without registering, and in still other counties his case is not provided for at all. The same diversity of regulation is found in various counties in regard to the case of a citizen who has moved into a county after the registration, but who is otherwise entitled to vote; and it will often happen that there will be two contiguous counties in the same congressional district, and in one the citizens will have the privilege of registering up to the day before the election, while in the other, voters possessing all the qualifications required by the constitution, are denied the right of voting by a registration which closed from six months to a year before the election. This wide-spread inequality is intensified in its gen- *261 • .■ral effect because in a multitude of comities in the state there are no registration laws whatever. The penalties of the various acts aro as various as the methods and the requirements for registration. It will often happen that persons in adjoining counties, voting, or attempting to vote, for the same congressman, will be punished differently for the same act; or the one will be punished and the other will bo guiltless of any violation of law. The inequality and illegality of the conditions thus enumerated are obvious, it is announced by eminent authority that, while registration laws are constitutional, their requirements must be reasonable and uniform, and equal facilities must be afforded to all the citizens of the state to comply with their requirements; otherwise, they are void. Cooley, Const, him. p. 601. This declaration is especially pertinent where the organic law of the state requires, as we have seen to be the; case in Georgia, the enactment of uniform and not special legislation, and where the registration clause of the constitution provides, not for the registration of a portion oí those otherwise qualified to vote, but for the registration of “all electors.”
For the I’easons stated, the court is of the opinion that, as constituting an abstacle to the appointment of supervisors to supervise a general election, the registration enactments of the general assembly of Georgia are inoperative and void, because in conflict with the constitution of the state. But, if this were not true, it would be none tlie less our duty to disregard them. They are plainly in conflict with section 2005 of the Revised Statutes, which provides:
“When, under the authority of the constitution or laws of any state, any act is required to be done as a prerequisite or qualification tor voting, and by such constitution or laws persons or officers are charged with the duty of furnishing to citizens an opportunity to perform such prerequisites, or to become qualified to vote, every such person and officer shall give to all citizens of the United States the same and equal opportunity to perform such prerequisite and to become qualified to vote. ”
Row, it is not enough that all the citizens of the same county shall have an equal opportunity, but all the electors of the state, voting, or desiring to vote, at the same general election, must have the equal opportunity to perform the prerequisites, and to become qualified to vole. And it is a necessary implication of the language of this statute of the United States that the prerequisites for voting at the same general election must be equal to each elector, indeed, it is true, if a state of the American Union prescribes for a portion of its citizens, otherwise entitled to vote, prerequisites for voting from which other citizens are relieved, to that extent the state ceases to maintain a republican form of government, and enactments with such effect are contrary to the constitution of the common country. It will be easy to understand how, with such a system, or want of system, of registration laws, as hereinbefore described, the most injurious and unfair political results might be attained. If a congressional district be “ gerrymandered ” with unequal registration law's, according to the political complexion of certain localities, the fundamental laws of the United States, guarantying equal political *262 rights, could be set at naught. The power of congress over national elections is no longer in question. This being a national election of general character, it is well to remember that it is clearly within the scope of the national laws. The supreme court of the United States has held that congress can by law protect the act of voting for members of congress, and the persons voting at such election from violence or intimidation, and the election itself from fraud and corruption. Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. Rep. 152; Ex parte Siabold, 100 U. S. 371. In the latter case, the court declares “ the exercise of such power can properly cause no collision of regulations or jurisdiction, because the authority of congress over the subject is paramount, and any regulations it may make necessarily supersede inconsistent regulations of the state.”
It follows, therefore, that since the federal law requires uniformity in the prerequisites of the right to vote as affecting the citizen, otherwise entitled to vote, at the national election, and further requires that each citizen shall have an equal opportunity to do the act made a prerequisite to the right of voting, varying and inconsistent registration enactments making different prerequisites, and denying equal opportunities to perform them, are contrary to the federal statute, and nugatory. The power of the state of Georgia to enact a general and uniform registration law is not questioned. The power is undoubted, and its exercise might well lead to the most salutary results, to the fairness and regularity of-elections. To conform, however, both to the state constitution and the national laws, it must have a uniform effect upon all electors, and we hold that such a registration law has not yet been enacted.
For the reasons above enumerated, the court feels obliged to disregard the objections presented by the representatives of the Young Men’s League, and will proceed with the performance of the duties assigned, in accordance with the statutes of the United Statesl