### FRANK SOLON v. THE STATE.

#### No. 3423.    Decided May 22, 1908.

**1.—Violation of the Election Law—Constitutional Law—Presumption.**

The rule is universal that the court will not declare an act of the legislature unconstitutional unless such infirmity and vice clearly appears.

**2.—Citizenship—Right to Vote, Not Inherent.**

The rule is that the right to vote is not a necessary or fixed incident to citizenship, or inherent in each and every individual, but that voting is the exercise of political power and no one is entitled to vote unless the people in their sovereign capacity have conferred on him the right to do so; and the right of suffrage may be regulated, modified or withdrawn by the authority which conferred it.

### 3.—Same—Legislative Power.

The legislature, both under its general authority as the law-making power of the State and under the express authority of the Constitution, is not prohibited from making such regulations as shall detect and punish fraud and preserve the purity of the ballot; even if such regulation may result in depriving citizens of the privilege of voting, so long as said regulation is intrinsically fair, and the failure to vote is the result of the failure of the citizen to bring himself within the terms of such regulation.

### 4.—Same—Constitutional Law—Qualification of Voter—Poll Tax.

Clause 7 of section 1, article 6 of the Constitution of Texas requires that the voter must have paid his poll tax before the first day of February next preceding the election at which he offers to vote; and the Legislature may enact such laws and regulations as may be necessary to preserve the purity of the ballot box, and impose reasonable and proper limitations upon the manner in which a citizen shall pay his poll tax, or the source from which he may obtain the money for paying same.

### 5.—Same—Case Stated.

Section 170 of the act of 1905 providing that any person who loans or advances money to another knowingly to be used for paying the poll tax of such other person is guilty of a misdemeanor, is constitutional, and the due exercise of legislative power, and does not interfere with the freedom of or impair the obligation of contract, and is not a deprivation of rights without due process of the law, or a denial of the equal protection of the law.

### 6.—Same—Loan of Money—Illegal Practices.

The practice of lending money on political assets is essentially vicious and corrupt, and no one has an indefeasable right to do so; and while the ballot under our government is free, legislation has been and will be demanded to throw around the ballot box all the safeguards which the experience of the ages has shown to be necessary.

### 7.—Same—Poll Tax—Equal and Uniform Taxation.

Apart from other constitutional provisions, section 7, article 3, of the Constitution of Texas is self-executing, and in terms levies a poll tax on all persons between the ages named, and is uniform and equal throughout the State upon all persons subject to the payment of poll taxes.

### 8.—Same—Legislative Power.

The power of the Legislature with reference to providing for the qualifications of voters can be restrained only by a prohibition expressed or implied from some provision or provisions of the Constitution.

### 9.—Same—Right to Contract—Police Power.

The right to contract is subject to the limitation which the State may lawfully impose in the exercise of the police power.

### 10.—Same—Reasonable Regulation—Purity of Ballot Box.

The power to make such regulations as may be necessary to preserve the purity of the ballot having been confided by the Constitution to the Legislature without defining limits to its discretion, that power includes judicial and executive attributes.

### 11.—Same—Right to Borrow Money—Subordinate to Purity of Election.

The right to borrow money is subordinate to the more valuable right of the people to have their elections protected against fraud and corrupt influence; and it is for the Legislature to protect this right within reasonable limitations.

Appeal from the County Court of McLennan. Tried below before Hon. J. W. Baker.

Appeal from a conviction for unlawfully, willfully and knowingly loaning money to pay the poll tax of another, in violation of the election law; penalty, a fine of $200.

Leaving out formal averments, the information was as follows: That Frank Solon in the County of McLennan and State of Texas heretofore on the 26th day of January, A. D. 1907, did then and there unlawfully, willfully and knowingly loan and advance to another, to wit: A. J. Ray, a sum of money, to wit: the sum of one and 75-100 ($1.75) dollars, good and lawful money of the United States of America, to be used for paying the poll tax of him, the said A. J. Ray, he the said Frank Solon, then and there knowing at the time that he so loaned and advanced the said money, that the same was to be used by him, the said A. J. Ray, for paying the poll tax of him, the said A. J. Ray, for the year 1906, to the tax collector of McLennan County, Texas; he, the said A. J. Ray, being then and there a resident citizen of said county and State, and subject to the payment of a poll tax in said county for the year 1906 under the law, and there having been then and there duly and legally assessed against him, the said A. J. Ray, a poll tax for the State and said county for the year 1906, under the laws of the State, and the orders of the Commissioners Court of said county in the said sum of $1.75, to wit: $1.50 to the State and 25 cents to the county, and the said poll tax then and there being due and unpaid by him the said A. J. Ray, and he the said A. J. Ray, being then and there in all other respects, other than the payment of said poll tax, a qualified elector under the laws of the State of Texas, in said county, and he, the said A. J. Ray, did thereafter on the said day and date use said sum of money so loaned and advanced to him as aforesaid, in the payment of his said poll tax, to the said tax collector of McLennan County, Texas, and did thereupon receive from said tax collector his poll tax receipt for the year 1906, as provided by law, against the peace and dignity of the State.

The opinion states the case.

*O. L. Stribling, Sanford & Denton,* for appellant.—The statute levying a poll tax is in violation of the constitution, article 1, section 3, in that it is class legislation, and of article 8, section 1, in that it is not equal and uniform, and it is not for that reason within the province of the Legislature to enact a law making it an offense for a person to loan or advance money to another for the purpose of paying the poll tax of such other person, there being no poll tax legally due to the State of Texas or any county therein. State Constitution, art. 1, sec. 3; art. 8, secs. 1 and 2; and art. 7, sec. 3; and art. 6, secs. 1 and 2, amended; art. 5048, Revised Statute; sec. 6, Act 1905, Terrell Election Law; sec. 83, Act 1905, State Militia; sec. 170, Act 1905,

Terrell Election Law; Ex parte Jones, 38 Crim. Rep., 482; Poteet v. State, 53 S. W. Rep., 869; Ex parte Overstreet, 46 S. W., 825; Hoefling v. San Antonio, 85 Texas, 28; Ex parte Vance, 42 Texas Crim. Rep., 619; 62 S. W., 568; Ex parte Battis, 40 Crim. Rep., 112; The Pullman Palace Car Co. v. The State, 64 Texas, 274; Lyman v. Martin, 2 Utah, 136; State v. Ide, 35 Wash., 576; Ib. 67 L. R. A., 280; Ib. 102 American State Rep., 914; Cooley Const. Lim., 902; Ex parte Woods, 52 Texas Crim. Rep., 575; Pullman Company v. State, 64 Texas, 275; 27 Am. & Eng. Enc. Law, 634.

Section 170 of the Act of 1905, known as the Terrell Election Law, is void for the reason that it is an unnecessary abridgment of contract between citizens of the State of Texas. State Constitution, Bill of Rights, sec. 19; Constitution United States, art. 14, sec. 1; Milliken v. City of Weatherford, 54 Texas, 388, and authorities there cited; Commonwealth v. Kisenberg, 8 Culp., 116; 4 Pa. Dist. R., 579; Shaver v. Pa. Co., 71 Fed., 931; Leep v. St. L. I. M. & S. Ry., 25 S. W., 75 (Ark.); Powers v. Shepard, 1st Abb. Prac., 129; 45 Barb., 524 N. Y.; People v. Warren, 34 N. Y. Supp., 942; Frorer v. People, 141 Illinois, 171; 31 N. E., 325; 16 L. R. A., 492; Braceville Coal Co. v. People, 147 Ill., 66; 35 N. E., 62; 22 L. R. A., 340; Ex parte Kubach, 85 Cal., 274; 24 Pac., 737; 9 L. R. A., 482; Lochner v. N. Y., 198 U. S., 45; Allgeyer v. Louisiana, 165 U. S., 578; Toney v. State, 109 A. S. R., 23; Booth v. People, 78 A. S. R., 299.

An Act which requires a voter to pay his own poll tax does not deprive him of the right to pay it by agent. State v. Dillon, 32 Fla., 586.

"Another rule of construction of Constitutions is that when the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition or to extend the penalty to other cases." Cooley Const. Limitations, p. 99.

Under this rule of construction it has been held that "the Legislature can not add to the constitutional qualifications of voters." Rison v. Farr, 24 Ark., 161; St. Joseph, etc., Railroad Company v. Buchanan County Court, 39 Mo., 485; State v. Williams, 5 Wis., 308; State v. Baker, 38 Wis., 71; Munroe v. Collins, 17 Ohio St., 665; State v. Symonds, 57 Maine, 148; Davies v. McKeeby, 5 Nev., 369; McCafferty v. Guyer, 59 Pa. St., 109; Quinn v. State, 35 Ind., 485; Clayton v. Harris, 7 Nev., 64; Morris v. Powell, 25 Ind., 281; s. c., 9 L. R. A., 326.

It is also held under the same rule of construction "that the Legislature can not diminish the constitutional qualifications of voters." Allison v. Black, 57 N. J. L., p. 6; s. c., 25 L. R. A., 480.

In the case of Allison v. Black, the Constitution prescribed the

qualifications of an elector in elections of all officers that were or would thereafter be elected by the people, and it was held that the Legislature could not change them. This is sustained fully by all the cases on the power of the Legislature to prescribe qualifications.

A statute imposing qualifications as to residence or payment of tax different from those authorized by the Constitution of the State is invalid. See note, Allison v. Black, 25 L. R. A., p. 480; also Rishel v. Luther, 2 Pa. Dis. Rep., 769; Quinn v. State, 35 Ind., 485; s. c., 9 Am. Rep., 754; People v. Canady, 73 N. C., 198; s. c., 21 Am. Rep., 465.

"While the elective franchise is a privilege rather than a right, and may be taken away by the power which conferred it, yet when it has been granted by the Constitution, it can not be abridged by the Legislature, and all laws and regulations of same must be reasonable, uniform and impartial." Munroe v. Collins, 17 Ohio State, 665; In re Newport Charter, 14 R. I., 655; In re Appointment of Supervisors, 52 Federal, 254.

"Where the Constitution of the State fixes the qualifications and determines who shall be deemed qualified voters in direct, positive and affirmative terms, these qualifications can not be added to by Legislative enactment. The Legislature has no power thus to disfranchise voters who are qualified by the express terms of the Constitution." Rison v. Farr, 24 Ark., 161; s. c., 87 Am. Dec., 52; People v. English, 139 Ill., 622; s. c., 15 L. R. A., 131; s. c., 29 N. E., 678; Quinn v. State, 35 Ind., 485; Kinneen v. Wells, 144 Mass., 497; s. c., 11 N. E., 916; State v. Fitzgerald, 37 Minn., 26; s. c., 32 N. W., 1113; State v. Findlay, 20 Nev., 198; s. c., 19 Pac., 241; s. c., 19 Am. State Rep., 346; Lyman v. Martin, 2 Utah, 136; State v. Tuttle, 53 Wis., 45.

"Any provisions which would impose upon a class of citizens conditions and requirements not imposed upon all others are void." Lyman v. Martin, 2 Utah, 136. This case has heretofore been cited in original brief, and in effect holds that a provision of the election law requiring that all male voters should be tax payers, without imposing the same condition upon female voters, is void. "In short, it is not within the power of the Legislature to deny, abridge or extend the constitutional right of franchise; or in any way to change the qualifications of voters, as defined by the Constitution of the State." Spier v. Baker, 120 Cal., 370; s. c., 41 L. R. A., 196; s. c., 19 Pac., 135; State v. Dillon, 32 Fla., 545; s. c., Sou. Rep., 383; s. c., 22 L. R. A., 124; 15 Cyc., p. 281-2; People v. Commissioners, 221 Ill., 9; s. c., 77 N. E., 321; State v. Drexel, 105 N. W., 174; State v. Monahan, 72 Kansas, 492-496; s. c., 84 Pac., 130.

"Extension of time to pay taxes does not extend time as required by the Constitution, so as to give right to vote." Ex parte Wood, 52 Texas Crim. Rep., 575.

*F. J. McCord,* Assistant Attorney-General, and *A. W. Terrell* and *John C. Townes,* for the State. Cited cases in opinion.

The Legislature of Texas has authority under our form of Government to enact any law which is not prohibited by the State Constitution, unless the power has been conferred on the Federal Government, or results as necessary and proper under some express grant of power—or is prohibited to the States.

"A State Constitution is not the origin of private rights; it is not the fountain of law; it is not the cause but the consequence of personal and political freedom; it grants no rights to the people; but is the creation of their power, the instrument of their convenience. The Constitution of the United States is one of delegated powers and Congress can only act in the exercise of the powers conferred. Those powers that are not delegated to the United States by the Constitution, nor prohibited by it to the States are reserved to the States and the people."

"The right to vote is not an inherent right, but is a privilege which is granted or denied by State Constitutions on grounds of general policy. Cooley's Constitutional Law, 752.

"The legislative power of Texas means all the power of the people which may be properly exercised in the formation of laws against which there is no inhibition in the fundamental law expressed or implied. * * * The power of legislation can be restrained only by a prohibition expressed or implied from some provision or provisions of the Constitution itself." Brown v. Galveston, 97 Texas, 15.

All those powers which relate to the internal police regulations of a State are not surrendered or restrained by the Constitution of the United States and the authority of the States over them is unqualified and exclusive. New York v. Miln, 11 Peters, 1029.

The right to contract is subject to the limitations which the State may lawfully impose in the exercise of the police power. Holden v. Hardy, 169 U. S., 366.

By the fourteenth amendment of the Constitution of the United States, the *power of States* in dealing with crime within their borders is not limited, *except* that no State can deprive particular classes of persons of equal and impartial rights under the law. J. Leper v. State of Texas, 139 U. S., 225 (642, 668) ; Hurtado v. California, 110 U. S., 516, and cases cited.

The Fourteenth Amendment of the United States Constitution is not designed to interfere with the power of the States (sometimes called the police power) to prescribe regulations to promote the health, peace, morals, education and general welfare of the people (nor as a result to prescribe regulations to secure the purity of the ballot, on which all other civil blessings depend). Barbour v. Connelly, 113 U. S., 27-28, 928.

Section 170 of the Texas election law which prohibits one man from loaning money to another with which to pay his poll tax knowingly is a proper exercise of the police power of the State; it was authorized by the State Constitution, and made necessary by conditions (which I will state further on) to preserve the purity of the ballot box. State Constitution, art. 6, sec. 4; State Constitution, art. 16, sec. 4.

The power to make "such regulations as may be necessary to preserve the purity of the ballot" (art. 6, sec. 4) having been confided by the Constitution to the Legislature, without defining limits to its discretion, that power includes judicial and executive attributes. 4 Dall, 141, 722.

If the loaning of money to pay a poll tax is contrary to public policy, inimical to public interest and to the purity of the ballot box (as I will show) then such a loan was subject to the police power of the State and within legislative control in the exercise of which the Legislature was vested with a large control *beyond the reach of judicial inquiry,* if it was exercised *bona fide* for the protection of the public. Louisville & N. R. Co. v. Kentucky, 161 U. S., 677.

"The police power of a State is an inherent and necessary attribute of sovereignty; it antedates all laws and may be described as the assumption on which Constitutions rest."

"The police power is not subject to any defined limitations, but is co-extensive with the necessities of the case and the safeguards of public interest." Black's Constitutional Law, sec. 149, 335; Canfield v. U. S., 167 U. S., 518, 42; 260.

The Fourteenth Amendment to the Federal Constitution did not take from the State the police power that it could exercise before that amendment. Such powers were left with the individual States and can not be taken from them wholly or in part and exercised under any legislation of Congress. Slaughterhouses cases, 16 Wallace, 36; Barbour v. Connelly, 113 U. S., 37; Mugler v. Kansas, 123 U. S., 623; 129 U. S., 26; 9 Wallace, 41; 11 Bush, 311; 49 Mich., 617; 97 U. S., 214; 97 U. S., 542.

The National Government can not, through any of its departments or officers, exercise any supervision over the police regulations of a State. 5 Howard, 504; 7 Howard, 283; 107 U. S., 59; 112 U. S., 580.

"It is well established that the Federal Constitution which refers to the obligation of contracts has no application to the act of a State under its police power. All contracts and all rights are subject to this (the police) power; and not only may regulations which affect them be established by the State, but all such regulations must be subject to changes from time to time as the general well being of the community may require, or as the circumstances may change, or as experience may demonstrate the necessity for. Thorpe

v. Burlington & Rutland R. R., 27 Vt., 140; Hageman v. Western R. Co., 16 Barb., 353; Dartmouth College v. Woodward, 4 Wheat., 518-629.

There is nothing in the Constitution of the United States which forbids the Legislature of a State from exercising judicial functions. Saterlee v. Mathewson, 2 Peters, 380.

The solicitude of those who framed the Constitution of Texas to invest the Legislature with ample power to secure the purity of elections is shown by the fact that it is twice emphasized in distinct and separate articles. Such a repetition on the same subject does not occur anywhere else in the Constitution. In each instance the *regulations* to protect the ballot are committed to the discretion of the Legislature and not to the courts. Section 2 of article 16 of the Constitution was copied from the Constitution of 1846. It reads as follows:

"Laws shall be made to exclude from office * * * and from the right of suffrage those who * * * shall hereafter be convicted of forgery or other high crimes. The privilege of full suffrage *shall* be protected by law, *regulating* elections, and prohibiting under adequate penalties all *undue influence* therein from power, bribery, tumult or other *improper practices.*" See sec. 2, art. 16, of State Constitution.

A command was issued to the Legislature again on the same subject in sec. 4, art. 6, as follows: "* * * The Legislature *shall* provide for the numbering of tickets and make such *other regulations as may be necessary* to detect and punish fraud and *preserve the purity of the ballot box* * * *."

DAVIDSON, PRESIDING JUDGE. Appellant was charged with violating section 170 of what is known as the Terrell election law passed by the Legislature in 1905, which reads, as follows: "Any person who loans or advances money to another knowingly to be used for paying the poll tax of such other person, is guilty of a misdemeanor." The facts show that appellant loaned A. J. Ray the sum of $1.75 for the purpose of paying his (Ray's) poll tax for the year 1906. Before Ray borrowed the money from appellant he informed him of the purpose of borrowing it, and what he intended to do with it, and he further swears that he did pay his poll tax; $1.50 went to the State, and 25 cents to the county. Ray was in all respects other than payment of the poll tax a qualified elector under the laws of this State.

Several questions are suggested for revision; among others, that this section of the election law is unconstitutional in that it was an abridgment of the right of the voter to pay his poll tax and thereby qualify himself to exercise the right of suffrage. The Constitution requires that a person who desires to vote should pay his poll tax by the

first of February of the year in which he offers to vote, but it does not prescribe the manner in which the paying shall be made, otherwise than to the tax collector; nor does it prohibit any one from borrowing money with which to pay the tax. Wherever the Constitution makes a declaration of political privileges or rights or powers to be exercised by the people or the individual, it is placed beyond legislative control or interference, as much so as if the instrument had expressly declared that the individual citizen should not be deprived of those powers, privileges and rights, and the Legislature is powerless to deprive him of those rights and privileges. It is another well settled proposition that the Legislature can not add to the Constitutional qualification of voters. It is also well settled that the Act of the Legislature must be as broad as the Constitution, or at least, it must not take from the citizen the rights, powers, and privileges conferred by the Constitution or reserved to the citizen in the Constitution. We believe that section 170 of the Terrell election law violates these propositions. This section 170 is illegal because it infringes the common right of voting reserved in the Constitution. Every citizen in Texas has a right to vote unless prohibited by the Constitution, or he cuts himself off from that right by either doing or refraining from doing something authorized by the Constitution by which his right to vote is curtailed. That the Legislature may regulate the manner of voting so as to guarantee pure and proper elections is fixed by the Constitution and every citizen of Texas has a right to vote except those who are interdicted by authority of the Constitution. Ray did not fall within any of those classes; he was a qualified voter, and the only impediment to his voting was his failure to pay his poll tax, and to secure that poll tax borrowed $1.75 from appellant; he had a right to borrow the money to pay his poll tax, as much so as he did to pay the ad valorem or any other tax required at his hands for the discharge of the obligations and duties devolving upon him as a citizen. The Constitution does not discriminate in favor of those who are able to pay their taxes and those who are not, and to give this section of the Terrell election law the construction that that law seeks would prevent or tend to prevent the poorer citizenship of the country from voting or qualifying themselves to vote by reason of their poverty. The construction of a law that would lead to such results certainly was never intended by the framers of the Constitution, and no such construction should be placed on the Constitution or a law that would lead to such conclusion. That the party must pay his tax before voting is contemplated by the Constitution, but that instrument does not bear the construction nor was it intended to bear the construction that a party who did not have the money should be cut off from borrowing it to pay his tax and qualify himself to vote. He has the right to vote, and the further right to take all legitimate means to qualify himself to exercise the power of franchise or right

of suffrage, and it would make no difference whether the party lending the money knew the borrower's purpose or not. This does not militate against the idea that if the borrower received the money for the purpose of selling his vote, or of casting it in the manner indicated by the lender, or by lending the borrower the money to influence his vote one way or the other, these would be criminal. This situation or probable situation seems to have been carefully guarded by article 160, and subsequent articles of the same law of 1905. Article 160 expressly provides, "Any person who lends or contributes or offers or promises to lend or contribute or pay any money or other valuable thing to any voter, to influence the vote of any other person, whether under the guise of a wager or otherwise, or to induce any voter to vote or refrain from voting at an election for or against any person or persons, or for or against any particular proposition submitted at an election, or to induce such voter to go to the polls or to remain away from the polls at an election, or to induce such voter or other person to place or cause to be placed his name unlawfully on the certified list of qualified voters that is required to be furnished by the county tax collector, is guilty of a felony, and on conviction shall be punished by confinement in the penitentiary not less than one year nor more than five years, and in addition shall forfeit any office to which he may have been elected at the election with reference to which such offense may have been committed, and is rendered incapable of holding any office under the State of Texas." Section 162: "The penalty prescribed in the last preceding section against those who violate any of its provisions shall be imposed on any one who receives or agrees to receive any money, gift, loan or other thing of value, for himself or any other person, for voting or agreeing to vote, for going or agreeing to go to the polls on election day, or for remaining away, or agreeing to remain away from the polls on election day," etc. So, section 170 was not intended to punish men who are corrupted by means of borrowing money to pay their poll tax. Not only is that condition of things punished in the Terrell election law, but by other provisions of our Penal Code.

We, therefore, hold that section 170 of said law, supra, is void, and on the further ground that it is an unnecessary and unreasonable abridgment of the right of contract. Constitution, art. 1, secs. 16 and 19; U. S. Constitution, art. 14, sec. 1, and Milliken v. The City of Weatherford, 54 Texas, 388, and authorities there cited.

We are, therefore, of opinion that the complaint and information do not charge a violation of the law, and that a prosecution can not be maintained under section 170, for which reason the judgment is reversed, and the prosecution ordered dismissed.

*Reversed and dismissed.*

Brooks, Judge, absent.

ON REHEARING.

June 24, 1908.

RAMSEY, Judge.—The appellant was charged, by information, in the County Court of McLennan County, Texas, with the violation of the provision of article 170 of the election law passed by the Twenty-ninth Legislature in that he did unlawfully, wilfully and knowingly loan and advance to one A. J. Ray the amount of his poll tax, knowing at the time that the money so advanced and loaned was to be used by Ray to pay such tax. A motion was made in the court below to quash the complaint and information for the reason in substance that the law under which the prosecution was begun was invalid and in contravention of the Constitution for that: 1. Said law is violative of section 1, article 14 of the Constitution of the United States in that it is an unreasonable abridgment of and restraint upon the liberty of the citizen to contract and an abridgment of the privileges and immunities of citizens of the United States. 2. That said law and especially section 170 of same is unconstitutional, invalid and void because it is an infringement on the inherent and indefeasible right of the citizen in the acquiring of property and in the pursuit of happiness. 3. That said section 170 on which the prosecution is based is null and void in that same is unreasonable and in contravention of the common right of the citizen as guaranteed to him under sections 19 and 20 of the Bill of Rights and other provisions of the Constitution of the State. 4. Because the offense charged could not be committed except there be in force at the time of the alleged commission, a valid law of the State levying a poll tax and there is and was at the time charged no such law. That the provisions of our Revised Statutes, article 5045, are invalid and unconstitutional in that they are obnoxious to section 3 of the Bill of Rights and other provisions of the State Constitution and to section 1, article 8, of the Constitution of the United States in that it is an abridgment of the privileges and immunities of the citizens of the United States and deprives persons of property without due process of law and also deprives persons of the equal protection of the law. 5. That said section 170 of the law in question is invalid and unconstitutional because the effect of same is to abridge, restrict and qualify the qualification of a voter under the law as fixed by the Constitution of the State. 6. That said section of said law, section 170, is null and void in that it is an unreasonable and arbitrary exercise by the legislature of the police power of the State. 7. That said section in question is invalid because the penalty fixed for the violation hereof, is contrary to the provisions of the Constitution of the State.

In the original opinion filed in this case the section of the statute in question was held to be unconstitutional, invalid and of no effect,

and the judgment of the court below was reversed and the prosecution dismissed. The opinion holds the section of the election law in question unconstitutional for the reason, among others, as stated, that "it infringes the common right of voting reserved in the Constitution." This conclusion is based on this proposition as stated in the opinion: "Every citizen in Texas has a right to vote, unless prohibited by the Constitution, or he cuts himself off from that right, by either doing or refraining from doing something authorized by the Constitution, by which his right to vote is curtailed." Again, the court say, "We, therefore, hold that section 170 of said law, supra, is void, and on the further ground that it is an unnecessary and an unreasonable abridgment of the right to contract. Constitution, art. 1, secs. 16 and 19; U. S. Constitution, art. 14, sec. 1, and Milliken v. City of Weatherford, 54 Texas, 388, and authorities there cited." If the law is in violation of the fundamental laws of the land and in contravention of our Constitution, State or Federal, it would inevitably follow that the motion for rehearing should be overruled and that whatever the result, we should adhere to our original holding. The motion for rehearing questions not only the correctness of the original holding but further asserts that the law is subject to no valid objection. To ascertain and properly decide this question it is proper if not indeed, indispensable to treat and consider the questions involved seriatim and in detail. If the law under which appellant is prosecuted is unconstitutional for any of the reasons assigned it must follow that the original opinion should stand. If, however, the law is valid, there is no other error committed on the trial which would necessitate a reversal, the motion for rehearing should be granted and the judgment of conviction should be affirmed. Section 170 of the act in question is as follows: "Section 170. Any person who loans or advances money to another knowingly to be used for paying the poll tax of such other person, is guilty of a misdemeanor." It was the intention of this act, which regulates in great detail both primary and general elections, to provide laws and establish a system which should throw all possible safeguards around elections, punish fraud, avoid corruption and guarantee a pure ballot and a fair count, and it should be upheld by the court, if under the Constitution, it can be done. The rule is universal that the courts will not declare an act of the Legislature unconstitutional unless such infirmity and vice clearly appears. Indeed this rule is necessary and evidences that respectful regard in which the judicial should hold the legislative department of our Government. On this question Mr. Cooley in his great work on Constitutional Limitations, p. 216, says: "It has been said by an eminent jurist, that when courts are called on to pronounce the invalidity of an act of the Legislature, passed with all the forms and ceremonies requisite to give it the force of

law, they will approach the question with great caution, examine it in every aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action and the act be sustained. The duty of the court to uphold' a statute when the conflict between it and the Constitution is not clear, and the implication which must always exist that no violation has been intended by the Legislature, may require it in some cases, where the meaning of the Constitution is not in doubt, to lean in favor of such a construction of the statute, as might not at first seem most obvious and natural. For as a conflict between the statute and the Constitution is not to be implied, it would seem to follow, where the meaning of the Constitution, is clear, *that the court,* if possible, must give the statement such a construction as will enable it to have effect."

We believe that there is no real conflict between the statute in question and our Constitutions, State or National, but that on fair and convincing legal reason the statute may stand and have full force and' effect. The argument of counsel for appellant as well as the original opinion of the court seems to proceed somewhat on the theory that the right to vote is one inherent in each and every citizen as such and that all constitutional or statutory provisions in regard thereto are limitations upon a pre-existing right incident to citizenship and that any law which directly or indirectly limits such pre-existing right is of necessity unconstitutional and' void. The true rule is that the right to vote is not a necessary or fixed incident to citizenship, or inherent in each and every individual, but that voting is the exercise of political power and no one is entitled to vote, unless the people in their sovereign capacity have conferred on him the right to do so. It may be laid down as a general proposition that the right of suffrage may be regulated and modified or *withdrawn* by the authority which conferred it. "The right is not a natural right of which a person can not be deprived, but is a privilege which may be granted or denied by the people, or the department of government to which they have delegated power in the matter, as general policy may require." 10 A. & E. Enc. of law, p. 568. "Participation in the elective franchise is a privilege rather than a right, and is granted or denied on grounds of general policy, the prevailing view being that it should be as general as possible, consistent with the public safety." Cooley Const. Lim. 752. In Anderson v. Baker, 23 Md., 531, it was held that the right of suffrage is the creation of the organic law of the State, and may be modified or withdrawn by the same authority which conferred it

without such withdrawal or modification being considered as the infliction of any punishment upon those disqualified. "None of the elementary writers include the right of suffrage among the rights of property or person. It is not an absolute unqualified personal right, but is altogether conventional. It is not a natural right of the citizen but a franchise dependent upon law by which it must be conferred to permit its exercise." 15 Cyc. of Law & Procedure, p. 280. In the case of The State v. Dillon, 32 Fla., 545; 14 S., 383; 22 L. R. A., 124, in treating this general subject the court say: "The right to vote is not an inherent or absolute right found among those generally reserved in bills of rights, but its possession is dependent upon constitutional or statutory grant. Subject to the limitations contained in the Federal Constitution the elective franchise is under the control of the sovereign power of the States expressed in constitutions or statutes properly enacted. Where a constitution has conferred the right and prescribed the qualifications of electors it, of course, is paramount until amended and the Legislature can not change or add to them in any way, but where the constitution does not fix the right of suffrage or prescribe the qualifications of voters it is competent for the Legislature as the representative of the law-making power of the State to do so. These principles are well recognized and fully established by authority in this country." Kinneen v. Wells, 144 Mass., 497 (59 Amer. Rep., 105); State v. Black, 54 H. J. L., 446; 16 L. R. A., 769; Huber v. Riley, 53 Pa., 112. The following cases support the principles and conclusions above stated: Minor v. Happersett, 12 Wall., 171; U. S. v. Reese, 92 U. S., 214; U. S. v. Cruikshank, 92 U. S., 542; Neal v. Delaware, 103 U. S., 370; ex parte Yarbrough, 110 U. S., 651; Whittaker v. Watson, 68 Ark., 555; 60 S. W., 652; Phillips v. Corbin, 46 Pac., 224; Freissleben v. Shallcross (Fla.), 69 Atl., 576; 8 L. R. A., 337; McMahon v. Savannah, 66 Ga., 217; 42 Am. Rep., 65; State v. Cain, 52 La. Ann., 2220; 28 So., 226; Selby v. Levee Commissioners, 14 La. Ann., 434; Hanna v. Young, 34 Md., 179; 35 Atl., 674; 57 Am. St. Rep., 396; 34 L. R. A., 55; Roane v. Matthews, 75 Miss., 94; 21 So., 665; Ford v. Hoden, 39 N. H., 143; Patterson v. Barlow, 60 Pa. St., 54; Castin v. Smith, 2 Serg. & R., 267; In re Realty Voters, 14 R. I., 645; State v. Old, 95 Tenn., 723; 34 S. W., 690; 31 L. R. A., 837; People v. Barber, 48 Hun (N. Y.), 198; Spencer v. Board of Registration, 1 MacArthur (D. C.), 169; 29 Am. Rep., 582; Anderson v. Baker, 23 Md., 531; Blair v. Ridgley, 41 Mo., 63; 97 Am. Dec., 248; DeWalt v. Bartley, 147 Pa., 529; 24 Atl., 185; 15 L. R. A. 771; Taylor v. Bleakley, 55 Kan., 1; 39 Pac., 1045; 28 L. R. A., 683; Attorney-General v. Detroit, 78 Mich., 545; 7 L. R. A., 99; Gougar v. Timberlake, 148 Ind., 38; 37 L. R. A., 644; People

v. English, 139 Ill., 622; 15 L. R. A., 131; State v. Blake, 25 L. R. A., 480, and note, where the authorities are exhaustively discussed.

It is settled in this State beyond cavil or controversy that "all political power is inherent in the people and free governments are founded on their authority and instituted for their benefit." Such is the declaration of section 2 of article 1, of our present Constitution. A similar provision was contained in the Constitution of the Republic of Texas, and in all our State Constitutions except that of 1869. Con. Republic, Declaration of Rights, sec. 2; Con. 1845, Bill of Rights, art. 1, sec. 2; Con. 1861, Bill of Rights, art. 1, sec. 1; Con. 1886, Bill of Rights, art. 1, sec. 1.

These specific and repeated declarations of our several Constitutions in the light of the authorities everywhere are conclusive, where their true intent and meaning can be ascertained in all departments of our Government, executive, legislative and judicial. It is obvious that the word "people" as here used means the aggregate or mass of the individuals who constitute our State. In them collectively is lodged our political power and this power is declared to be inherent. It is but another way of stating the fundamental truth on which our free institutions are based, the right of the majority to rule. If all political power were inherent in each or any individual, despotism would result. "There can be no government where every individual is supreme and a law unto himself." The golden mean between these two extremes, the free and democratic government, which in the language of the Fathers, "establishes justice, insures domestic tranquility, provides for the common defense and the general welfare, and secures the blessings of liberty to its founders and their posterity" is that which is based on the fundamental truth, that all political power is inherent in the people collectively. It is not strictly accurate to say, as we believe, as was said in the opinion in this case that "every citizen in Texas has a right to vote unless prohibited by the Constitution or he cuts himself off from that right by either doing or refraining from doing something authorized by the Constitution by which his right to vote is curtailed. That the Legislature may regulate the manner of voting so as to guarantee pure and proper elections, is fixed by the Constitution and every citizen of Texas has the right to vote except those who are interdicted by authority of the Constitution." We think this expression is not accurate in its entirety. Indeed, as we conceive, the whole opinion proceeds to some extent at least on the erroneous assumption that our State Constitution is in the nature of a grant of power. The true rule and theory is that all power adheres in the people in their collective capacity except such as is in terms granted to the Federal Government or the exercise of which is prohibited in the Constitution. On this question Mr. Cooley in his work on Constitutional Limitation, p. 11, says: "The Gov-

ernment of the United States is one of enumerated powers; the national Constitution being the instrument which specifies them, and in which authority should be found for the exercise of any power which the national government assumes to possess. In this respect it differs from the constitutions of the several States, which are not grants of powers to the States, but which apportion and impose restrictions upon the powers which the States inherently possess." Again, the same author, p. 49, says: "In considering State constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed." Again, it is said in the case of People v. Hurlbut, 24 Mich., 107: "If this charter of State government which we call a constitution were all there was of constitutional command; if the usages, the customs, the maxims that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests; the precepts that have come to us from the revolutions which overturned tyrannies; the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain; but the living spirit,—that which gives it force and attraction, which makes it valuable and draws to it the affections of the people; that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give—this living and breathing spirit which supplies the interpretation of the words of the written charter would be utterly lost and gone."

Unless then, the legislation here sought to be stricken down is in violation of some express prohibition of the Constitution, or such prohibition as may by fair and proper interpretation, be said to be reasonably included by implication within such prohibition, it should be sustained and given effect. Let us then with care, and at such length as may be necessary consider whether such inhibition or prohibition is contained in our Constitution or whether by fair construction it is of necessity to be found by fair implication. It would, we think, be conceded on all sides that to the extent that the right to vote is conferred by the Constitution, it can not be taken away by any action of the Legislature, nor could this right be conferred upon any person or class of persons to whom, in the

Constitution it is in terms denied. That while such right or privilege to vote is derivative, and not primary, the Legislature can not add to the qualifications or require additional ones. It does not follow, however, nor can we concede that therefore, the Legislature, both under its general authority as the law-making power of the State and under the express authority of the Constitution is prohibited from making such regulations as shall detect and punish fraud, preserve the purity of the ballot and make our free institutions the "pride and wonder of earth." Nor is such regulation invalid because it may result in depriving a citizen of the privilege of voting, if it is intrinsically fair and the failure to vote is the result of the failure of the citizen to bring himself within the terms of such regulations if the law makes provision that he may have a reasonable opportunity so to do. On this question Mr. Cooley says (Const. Lim., p. 756): "While it is true that the Legislature can not add to the constitutional qualifications of electors, it must nevertheless devolve upon that body to establish such regulations as will enable all persons entitled to the privilege to exercise it freely and securely, and exclude all who are not entitled from improper participation therein." The provisions for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. Such regulations must always have been within the power of the Legislature, unless forbidden. Many regulations resting on the same principle are always prescribed and have never been supposed to be open to objection. Although the Constitution provides that all male citizens twenty-one years of age and upwards shall be entitled to vote, it would not be seriously contended that a statute which should require all such citizens to go to the established place for holding the polls and there deposit their ballots and not elsewhere, was a violation of the Constitution because prescribing an additional qualification; namely, the presence of the elector at the polls. All such reasonable regulations of the constitutional rights which seem to the Legislature important to the preservation of order in elections to guard against fraud, undue influence and oppression, and to preserve the purity of the ballot box, are not only within the constitutional power of the Legislature, but are commendable, and at least some of them absolutely essential." What then are the provisions of our Constitution in respect to the qualification of voters and which of these provisions can it be held, tested by the rule here laid down, does the section of the law in question contravene? The constitutional qualifications for suffrage in this State are as follows: (1) The persons must be subject to none of the disqualifications named in section 1, article 6 of our Constitution, such as minors, lunatics, felons, etc. (2) He must be a male. (3) Twenty-one years of age or more. (4) He must be a citizen of the United States, or have made proper declaration of his intention to become such citizen. (5) He must have resided

a year within the State and six months within the county where he proposes to vote. (6) He must reside within the precinct in which he votes, and (7) He must have paid his poll tax before the first day of February next. preceding the election at which he offers to vote. The first six named qualifications appear substantially in all our State Constitutions from the foundation of our State as such. The seventh qualification, in respect to payment of poll tax, was added by the amendment adopted in 1902, and should be given effect by appropriate legislation and such enforcement as may be necessary by the courts, in accordance with its true intent and meaning. Such payment of a poll tax by the citizen is one of the conditions precedent to his right to vote. If this statement is true and it would seem under the authorities and in reason to be undisputable, then it would follow that while the Legislature may not deny to any one the right of suffrage granted in the Constitution, it may, and every suggestion of patriotism and self-preservation suggests that it should, enact such laws and regulations as may be desirable or necessary to detect and punish fraud, preserve the purity of the ballot box and to this end impose reasonable and proper limitations upon the manner in which one shall pay his poll tax or the source from which he may obtain the money for paying same.

It is proper that we may consider the history of the times in construing current legislation. The law being considered applies not only to the elections authorized by law, but to those elections held somewhat under the direction of political parties. It is a fact known of all men that in the State at large and in most of the counties of the State a nomination by the dominant political party is equivalent to election. For all practical purposes it *is* the election, and the elections which are authorized to be held biennially in November, merely ratify the selections named in the party primary in the July preceding. That man must have been blind indeed and heedless of events occurring all around him who does not know that in the old days in the cities, and the congested centers at least, that, in the absence of legal regulation, such elections were the prolific source of unfairness and corruption and the theater of the dominance of the worst elements of our population. Conditions became intolerable. Sinister interests and too frequently prodigal, but always purposeful expenditures of money by unscrupulous agencies, sought to control and sometimes did control elections and the patriotic citizen saw corrupt and vicious influences dominate where under proper safeguards, the will of the people, free and unpurchasable, would have controlled. The duty to protect the purity of the ballot box is broad and far reaching. That was the overshadowing and controlling purpose of the Terrell Election Law. Everything else was but an incident to this dominant purpose and object. The purity of the ballot consists not alone in the right of

the individual to vote but includes as well, and of necessity, the right of the public to have the election conducted in all things in such a manner as to assure the rule of the majority fairly expressed under the regulations prescribed by law. It follows, therefore that the Legislature, in determining what is a proper regulation essential in securing the purity of the ballot shall look as well to the counting and value of the ballot as to its mere casting, and shall look upon each ballot and the right to cast it not only with reference to the individual who deposits same, but to the aggregate of individuals whose rights are to be affected by the ballot cast as well as to the effect on our people, and their right to the due preservation of our free institutions. If one citizen, in the exercise of his right to vote, expresses thereby his honest and patriotic judgment he is, of course, subject to have that vote cancelled and its effect destroyed by the honest expression of a different opinion by another qualified elector, but that can not be regarded as a pure and fair ballot and an honest and fair election, in which, not citizenship but money casts the ballot, and the patriotic citizen finds his vote cancelled by one who, for money consideration, has cast a ballot which he was either too indifferent or too shiftless himself to deposit. It follows, therefore, we think, that in determining the validity of any regulations of the election franchise, the court should look, indeed must look, not only to the effect of such regulation upon the rights of the individual but upon its general result and effect in maintaining the freedom of our political institutions and the right of self-government.

It has been uniformly held from the days of Marshall that even in respect to the National Congress that they may exercise such authority as is essential or necessary to carry into effect the power delegated to them. It is an axiom in mathematics, and it is true in law that things which are equal to the same thing are equal to each other. It would not be denied that the Legislature could pass laws to prevent, for money or merchandise, the bribery of the elector and the corruption of the ballot. Whether such corruption or corrupt control finds expression in one form or another can, in law, or in fact, make little difference. The fact that such improper or corrupt control is indirect can not make its influence and effect less baleful or ruinous. It is another axiom of the law that you can not do indirectly what is forbidden to be done directly. It would not be contended that the law could not punish the shameless criminal who with his vile money in hand, directly pays such money to the voter in consideration that he shall vote for a particular man or measure. But suppose in some contest that instead of doing this, some sinister interest, in view of some election contest which is known to be pending, goes or sends "unto the highways and by-ways" and compels by persuasion or otherwise, the morally blind or otherwise halt to come in and says to them, "I will lend you the money to pay your poll tax and therefore the right to vote will

be yours, without (to you) money and without price." Could this course be one which the law could not either punish or prevent? Can avarice and selfish greed assemble the vote of the shiftless and the vicious elements of society and by advances of money clothe them with the qualifications of electors and the law be powerless and impotent? If these questions may be answered in the affirmative, then it seems to us the law in question is invalid, but we at the same time must recognize, that under our Constitution, we are powerless to protect society from the indirect but none - the less powerful assaults of those whose interests may lead them to corrupt the source of all political power. We have seen that the right of suffrage is "not included among the rights of property or person." That "it is not an absolute right but is altogether conventional. It is not a natural right of the citizen, but a franchise dependent upon law, by which it must be conferred to permit its exercise." Therefore, we believe and hold that where as in the statute before us, the law recognizes the constitutional right to vote, and is instituted for the purpose and to the end that such right may be safeguarded and also to protect the fairness of the election and the purity of the ballot, and where the rights of all those interested in the public good are recognized, under provision that they shall be fairly diligent in securing such right to vote and when every one is given a reasonable and fair opportunity to qualify himself to vote, a provision of the law that no voter may by securing money to pay his poll tax, by loan from one who is advised of the purpose of such law, and who may presumably have an improper motive to make such advance and a sinister interest in qualifying such elector and where the effect of such transaction may be to corrupt the electorate and debase our elections does not as a matter of law, because in violation of our Constitutions, State or National, qualify and destroy such helpful and needed provision. On the contrary such a provision, designed to prevent the prostitution of the ballot, the practical purchase of votes and voters and which if enforced will have that effect, is a reasonable and needed regulation of the privilege or right of the elective franchise, and the fact that uninterested and indifferent persons may lose their votes through their own negligence is no objection to such regulation.

By analogy, many decisions may be found in the books supporting these views. The precise question, if it has ever been decided, has not been discovered by us, nor have we been cited to any case by counsel on either side, which settles it. Many courts, however, have discussed the effect of noncompliance with registration laws. These decisions in respect to these matters, state the rule, as we understand, substantially as above expressed. In the case of Owen Cusick's Appeal, 10 L. R. A., 222, the Supreme Court of Pennsylvania had under consideration the validity of a very stringent registration law. This act, of date January 30, 1874, which required that any

person whose name is not registered on election day, to prove by affidavit certain facts as to his age, residence, naturalization, payment of taxes, was held valid and its provisions mandatory and not to be in violation of the State Constitution which declared that no elector shall be deprived of the privilege of voting by reason of his name not being registered. In that case Paxter, C. J., speaking of the court says: "The Constitution having thus fixed the qualifications of voters, it is not in the power of the Legislature to either enlarge or abridge them. While the Constitution has thus defined the rights of voters, it is silent in many respects as to how those rights shall be exercised. It prescribes very clearly the qualifications which a voter must possess, but it provides no machinery by which to ascertain whether a particular voter possesses such qualifications. All this has been wisely left to the Legislature. It would be out of place in the Fundamental Law. Lightly as many persons appear to regard the right of citizenship, the history of the government fully bears out the assertion that the exercise of the elective franchise has been productive of a vast amount of fraud. And it is a kind of fraud that strikes at the integrity and imperils the existence of free government. This assertion is not made at random. We have judicial knowledge whereof we speak. Our books are full of cases where such fraud has been developed." And in summing up the whole matter this learned judge says:

"Nor is it any hardship to the naturalized citizen to require him to state, when, where and by what court he was naturalized. They obtain the great privilege of American citizenship cheaply enough to justify their graceful submission to the laws of the country of their adoption. When the illustrious Paul asserted his right as a Roman citizen to be heard before he was condemned, the chief captain said to him, 'With a great sum obtained I this freedom,' to which Paul replied, 'But I was free-born.' We are more generous than was imperial Rome, and the citizenship for which she exacted a 'great sum' we bestow freely upon all who ask for it. As before remarked, the contention upon this point settles down to the argumentum ab inconvenienti. It may be that the careless voter who does not value his privilege sufficiently to see, as every one can see with little trouble, that his name is placed upon the registry lists, and who gives no thought to the means to establish his right to vote until he comes to the poll to deposit his ballot, may suffer some inconvenience, and in some instances lose his vote, not because he is not duly qualified, but for the reason that he has not the means of proof at hand to satisfy the tribunal which the law has appointed to hear his case. So the litigant in a suit at law may be defeated, though his case be never so good, if he fails to produce his evidence at the proper time. When an unregistered elector offers his vote at the poll the law challenges it instantly, and he knows that he can only avoid the challenge by a strict compliance with the require-

ments of the statute. If he comes to the poll without his proof, it is his own folly and improvidence. He has no right to expect that his indifference to his rights, or indolence in asserting them, are to be condoned by nullifying the provisions of a law which is the main bulwark of the purity of the ballot, and which deprives no qualified elector of his right, except as the result of his own indifference to his duties as a citizen."

Is the provision of the Act in question here assailed unreasonable, and does it deprive any citizen otherwise qualified, of his right to vote? An elector in this State is required to pay a poll tax of one dollar and seventy-five cents. He has the whole twelve months of every year within which to pay it. He may make such payments out of any funds he has, or may borrow, subject alone to the restriction that it may not be loaned by one knowing the purpose to which such funds are to be applied. It would seldom happen that any man worthy to vote could not borrow this sum either on his general credit or on the faith of some security which he is able to give. This places the loan on the right basis. If, however, the money is loaned or advanced with the knowledge of the purpose to which it is to be devoted it gives opportunity to designing persons to place such proposed borrower under such obligations as to give him a hold, from a sense of gratitude or semi-proprietorship, as will or may enable him to absolutely dominate and control such elector. Of course, it might often happen that under such circumstances and with knowledge of the purpose to which it would be applied, a loan might be made as an act of neighborly kindness and without improper purpose. On the other hand, in the absence of this provision, or if it is to be held unconstitutional, it would authorize, if not encourage a vile traffic in poll tax receipts and make possible conditions which in a free country would be intolerable. Many acts denounced by law as offenses, which are not intrinsically wrong, or such as involve moral obliquity or turpitude, occur under some conditions where to punish same will operate as a hardship, if not indeed, an injustice. Whether in any given case the general result and effect is one good or evil, must in the nature of things be determined by the lawmaking body. If the Legislature, mindful of all human experience inspired by the declarations of holy writ that it is wisest and best to abstain from "all appearance of evil" see fit to make an offense, an act or acts which may degrade the election franchise into a matter of bargain and sale, it is not for this court to set aside their enactment so declaring, unless such act is clearly in violation of the Constitution. So far from being inhibited by any provision of our Constitution, it seems to us that this action is fairly embraced within the terms of article 6, section 4, of our Constitution. It is there provided: "In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to de-

tect and punish fraud and preserve the purity of the ballot box; and the Legislature may provide by law for the registration of all voters in all cities containing a population of ten thousand inhabitants or more." It has been held that this section declaring that all elections are to be by ballot is no restriction on the Legislature to provide that the will of the persons desiring territory to be annexed to a municipal corporation, may be ascertained in some other way, namely: by petition to the City Council. Graham v. City of Greenville, 67 Texas, 63; State v. City of Waxahachie, 81 Texas, 626. However, we think as applied to elections for offices and other elections held under State authority that the provisions of the Constitution that the election must be by ballot would be both controlling and exclusive. But in addition to this provision and the one in respect to numbering ballots, the Legislature is not only authorized, but it is made their duty to "make such other regulations, as may be necessary to detect and *punish* fraud and *preserve* the purity of the ballot box." What measures are necessary to accomplish these objects the Legislature must determine, and when they have so determined and by proper legislative action have passed laws to attain this result, it is our duty not to destroy, but rather to decree that they shall live and do their perfect work. Nor does the act in question, in the legal sense interfere either with the freedom of or impair the obligations of contract as these terms have heretofore been understood. The right to contract is always limited, to some extent at least, by the police power of the State. No agreement that tends to the destruction of our political institutions or the corruption of our elections, State or National, can be lawful, and no agreement that is unlawful can be dignified as a contract. It is as we have stated above, not only possible, but quite likely that one might loan money to another to pay his poll tax with knowledge of the fact that it was to be so used and in doing so, act with entire honesty, pure motives and in the utmost good faith. That it is not only possible and would doubtless frequently so happen. But this by no means interferes or should interfere with the right of the State to prevent the loaning of money for such purpose, if such form of loan can be made effectively a disguise for or means of corrupting the ballot. That the police power of the State extends to preventive means and measures is well settled. Under the Constitution the right to bear arms is guaranteed to any citizen. And yet for the public good our court and other courts all over the land have uniformly sustained as constitutional, laws against carrying concealed arms, pistols, etc. The use of police power for the purpose of prevention is so well established that it can not now be questioned.

Nor can said section in question be held unconstitutional because it authorizes any deprivation of rights without due process of law or because same works a denial of the equal protection of the law. The right of suffrage is not a right of person or property. 15 Cyc.

·of Law & P., p. 280. Besides, no one ever had, or can have the right to corrupt the ballot. To deny such alleged right and prevent an opportunity to do such wrong, the Legislature may pass any needed regulation which is not in itself so unreasonable as to practically deny the right to vote at all. If any given act or course of conduct has the tendency, involves the probability and may in its operation have the effect to corrupt the ballot and undermine or overthrow our government, it ought to be prohibited by law, and such an act can legally make it an offense for any one to lend money to another on his potentiality as a voter. The practice of lending money on political assets is essentially vicious and corrupt and no one has an indefeasible right to do so. The crying evil of the age is the use, the improper use, of money in elections. While the ballot under our government is free and well nigh universal, and should and ever will remain so, legislation has been and will be demanded to throw around the ballot box all the safeguards which the experience of the ages has shown to be necessary to protect society alike from the avarice, and greed of corrupt commercialism and the threatened attacks of both the cormorant and the commune. The regulations and provisions here assailed were enacted with this intent and in the opinion of the Legislature will have this effect. A large deference should be yielded by the judiciary to their opinion. To this department of our government these matters are referred and committed.

It is contended again that the Act in question is invalid because the poll taxes attempted to be levied by law are unconstitutional and therefore invalid in that they are not equal and uniform and do not apply equally to all voters in the State. If this contention is sound it could not be made an offense to aid, by way of loan or advance of money, in doing what the Legislature had no authority to require to be done. To sustain this contention would not only lose to the State and the many counties and cities in it, an immense revenue running into the hundreds of thousands of dollars annually, impair the efficiency of our free school system and emasculate our election law, but would do violence, not only to the contemporaneous construction and administration of these laws, but to that construction and administration of them which has obtained in this State for more than a generation. This we ought not to do unless compelled thereto by such plain provision of the Constitution and sustained by such cogency of reasoning as would leave us practically without discretion in the matter. Article 5048 of our Revised Civil Statute, is as follows: "There shall be levied and collected from every male person between the ages of twenty-one and sixty years, resident within this State, on the first day of January of each year (Indians not taxed, and persons insane, blind, deaf and dumb or those who have lost one hand or foot, excepted), an annual poll tax of one dollar and fifty cents, one dollar for the benefit of free schools, and fifty cents for general revenue purposes; provided, that no county shall levy

more than twenty-five cents poll tax for county purposes." Section 3 of article 7, of our Constitution, among other things provides: "One-fourth of the revenue derived from the State occupation taxes, and a poll tax of one dollar on every male inhabitant of this State between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools." Among the provisions of section 1, article 8, are the following: "Taxation shall be equal and uniform. * * * The Legislature may impose a poll tax. It may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State." The last quoted article merely says that the Legislature may impose a poll tax. Article 3 of section 7, says that a poll tax of one dollar on every male inhabitant of this State between the ages of twenty-one and sixty years shall be set apart annually for the benefit of the public free schools. Under this provision of section 3 of article 7 of the Constitution above quoted, there is, in express terms, levied in this State a poll tax on every male inhabitant thereof between the ages named therein, and if this section of the Constitution is to control, such poll tax is fixed without the necessity of legislative action. The provision standing alone is definite, fixed and as certain as any legislative action can make it. We think the law, if we shall hold this section controls, could be sustained on the ground that this provision of the Constitution is self-executing and in terms levies a poll tax on all persons between the ages named and that the exceptions of the persons and classes of persons named in article 5048 of our Revised Statutes could be held to be invalid and unavailing so that the law and tax could stand and the attempted exceptions fail.

If, however, this view is not correct, then clearly the tax may be sustained upon another ground. Section 1 of article 8, in respect to poll taxes, as same appears in the Constitution, is as follows: "The Legislature may impose a poll tax." The authority here given is general and unless it can be held to be modified by other provisions of the same instrument, is substantially without restrictions on the power of the Legislature. The Constitution provides, section 2, article 8: "All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax." There is no such provision in respect to the poll tax unless it can be found in the first sentence of section 1 of article 8, to the effect that "Taxation shall be equal and uniform." Occupation taxes are levied on the business conducted and not upon the person, or with reference to the person engaged in it. The law in respect thereto takes no cognizance of age, sex or previous condition of servitude. On all persons of the same class,—that is, in the same business wherever situated and of whatever name or station, the law levies the same tax and if certain persons of the same general class are excepted, and special immunity granted to them, the law will be held to be in-

valid. This doctrine was expressly recognized and applied in the case of Ex parte Woods, 52 Texas Crim. Rep., 575; 108 S. W. 1171; but the rule is well nigh universal and in all the cases in this State, in respect to occupation taxes, it has been uniformly held, both by this court and by our Supreme Court that not only the right, but the duty of reasonable classification inheres in the Legislature. In the case of Pullman Car Company v. The State, 64 Texas, 274, Judge Slayton, speaking for the court and discussing our laws with reference to occupation taxes, says:

"The Legislature may classify the subjects of taxation and these classifications may, as they will, be more or less arbitrary, but when the classification is made, all must be subject to the payment of the tax imposed, who by the exercise of the tax on which the classification is based, fall within it, unless excepted under some other constitutional provision." See also Ex parte Jones, 38 Texas Crim. Rep., 482. In dealing with occupations and their classification, neither age, sex, or physical condition of the person pursuing the business could enter into, form the basis of or have any relation to any separation between the different occupations. These cases and analogies drawn from cases in respect to occupation taxes can have little bearing on, and ought not to control our decision on this question. So far as applicable at all, they should rather be held to sustain the law here assailed in that they, in express terms, recognize the authority of the Legislature to classify subjects of taxation. Applying this rule to the matter of poll taxes and our statutes in respect thereto, the subject of taxation, as provided in them, is persons —polls—and in respect thereto the Legislature, under the limitations of our Constitution is authorized to classify these subjects of taxation. We would undoubtedly condemn a discrimination in poll taxes based merely upon occupations. We could not recognize in respect to occupation taxes, any distinction of sex, but if in respect to persons pursuing any business, the tax is uniform it would be upheld and sustained. The reason is both obvious and just. Occupation taxes can not be fairly and justly classified by reference to persons who pursue them. Persons can not justly and properly be classified by the occupations they follow. The discrimination allowed and recognized by law in classifying occupation taxes, must relate to the occupations themselves. Here the law undertakes to say that certain persons of a given class, applying uniformly and equally throughout the State, are subject to the payment of poll taxes. This, under the general authority of the Constitution to impose poll taxes, it is authorized to do. We hold, therefore, these truths to be self-evident: (1) The right to vote is not an inherent right, but is a privilege which is granted or denied by the State on grounds of general policy. (2) The power of legislation can be restrained only by a prohibition expressed or implied from some provision or provisions of the Constitution. Brown v. Galveston, 97 Texas, 15.

(3) All these powers which relate to the internal police regulations of a State are not surrendered or restrained! by the Constitution of the United States and the authority of the States over them is unqualified and exclusive. New York v. Miln, 11 Peters, 1029. (4) The right to contract is subject to the limitations which the State may lawfully impose in the exercise of the police power. Holden v. Hardy, 169 U. S., 366. (5) The power to make "such regulations as may be necessary to preserve the purity of the ballot" (article 6, section 4) having been confided by the Constitution to the Legislature, without defining limits to its discretion, that power includes judicial and executive attributes. (6) The right to borrow money is subordinate to the more valuable right of the people to have their elections protected against fraud and corrupt influence. What regulations are necessary to effect this protection is for the Legislature to determine and their determination and provisions within reasonable limitations, must be sustained.

We have thus, at a greater length perhaps than is necessary, gone into this matter for the reason that in our judgment no more important question has been before this court from the day of its organization to this hour. Indeed, the question here involved and similar questions, if decided adversely to the State, would or might mean the end of fair elections and an honest ascertainment of the people's will. If it is impossible, under our Constitution, to prohibit and punish a loan or advance of money which may or can be made the means of corrupting our elections, then indeed, ought the Constitution of this State be changed. If this can not be prevented, then in every city and center of this State recruiting offices of vice may be established, and through the sinuous agencies of designing persons, by advances of money with assurances of that return which gratitude or self-interest would prompt, the baser elements of the community may, in invitum, be clothed with the certificate of the voter and turned loose as the deciding power of our elections to sap the foundations and undermine the laws of our free institutions. We can better spare anything than an honest ballot and a fair count. If the people make mistakes as to officers and by misadventure elect those unfit for office, they can, at their swift recurring elections, displace them and elect those worthy to sit in high places. "A breath can make them as a breath hath made them," but when the integrity and honesty of our elections are gone, all is gone.

> "While stands the Coliseum, Rome shall stand,
> When falls the Coliseum, Rome shall fall,
> And when Rome falls, the world."

If this question were to be the end of all of the attacks upon the suffrage of the State, it might not be so serious, but if it shall be held the State hath no power to punish or prevent this form of corruption and bribery, or its equivalent, then where shall we stop in this State on our further attack on the power of the Legislature

to insure honest suffrage? If we say that the Legislature can not pass a law which shall protect society and punish him, or them who will defy the law by advances of money under such circumstances as to lead to corruption or bribery,

> " 'Twill be recorded for a precedent;
> And many an error, by the same example,
> Will rush into the State; it can not be."

The record in this case shows every fact which, under the law, is essential to conviction. Being firmly convinced that the original opinion of this court was and is erroneous, the State's motion for rehearing is granted, the order of reversal set aside and the judgment of conviction in all things affirmed.

We desire in this connection to make mention of the aid received from the brief and argument filed in this cause by Hon. A. W. Terrell and Judge John C. Townes of the Austin Bar. In wealth of illustration, cogency of reason and clearness in presenting the issues involved, they leave nothing to be desired. Indeed, we have drawn freely upon the learning which these gentlemen have brought before us, and whatever merit there may be in this opinion must be attributed largely to the aid so rendered.

*Affirmed.*

[Motion for rehearing overruled, December 9, 1908.—Reporter.]


DAVIDSON, PRESIDING JUDGE (dissenting).—I have read with great pleasure the opinion of my Brother Ramsey concurred in by my Brother Brooks, granting a rehearing and affirming the judgment in this case. The opinion shows great research of authorities and elegance of diction. I am still firmly convinced of the correctness of the original opinion.

While the Legislature has authority, and is bound by obligations of duty, to pass suitable laws regulating and controlling the manner of holding elections and safeguarding the purity of the ballot box, yet those regulations must be reasonable, not arbitrary and harsh, and especially they should not be carried to the point of imputing fraud and corruption upon facts that will not justify such imputation. Section 170 of the Terrell election law evidently was not intended to reach that class of voters who might accept money or a consideration to influence their votes, because the language does not warrant such conclusion, and those questions are thoroughly covered in other sections of the law, notably section 160. This latter section covers every imaginable case where a voter could be bribed or influenced in any way by the acceptance of such consideration. Section 170, under which appellant was convicted, does not undertake to go farther than to prohibit the lending of money for the purpose of paying poll tax. It does not include the idea that such borrowing shall influence the borrower. If borrowing money was intended to influence a voter, and the voter so accepted it, both would be guilty

of a felony under section 160. If sections 160 and 170 are intended to reach and suppress the acceptance on the part of the voter of a consideration to affect his vote, then we have two statutes meaning the same thing, creating the same offense, but imposing different penalties, one being a felony and the other a misdemeanor. These sections are in the same act, passed at the same time, and would in that event nullify each other. And it is also out of harmony with section 16 of the Terrell election law wherein parties are authorized to pay the poll tax for other voters under circumstances therein specified. If the agent or friend of a voter can advance money and pay the poll tax for that voter, he would be justified under section 16, but punishable under section 170. However, I do not purpose to discuss this phase further, but refer to what was said in the original opinion.

The more important question arises on the unconstitutionality of the law in regard to imposing a burden upon some voters and relieving others from the same burden. In respect to the right of suffrage under the different clauses of our Constitution this can not be done. If the statute levying a poll tax is in violation of constitutional provisions, then it is conceded by my brethren to be invalid, but this question they meet with the doctrine of classification. Before discussing these matters, I will call attention to some of the provisions of the Constitution. Article 1, section 3, of that instrument provides, "All free men when they form a social compact have equal rights, and no man or set of men is entitled to exclusive separate public emoluments or privileges, but in consideration of public services." Article 8, section 1, provides: "Taxation shall be equal and uniform. * * * The legislature may impose a poll tax. It may also impose occupation taxes." And it further provides in section 2 of article 8, that all occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax. Article 7, section 3, also provides, that, "One-fourth of the revenue derived from the State occupation taxes, and a poll tax of one dollar on every male inhabitant of this State between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools." Article 6 provides that any voter who is subject to pay poll tax under the laws of the State of Texas shall pay said tax before he offers to vote at any election in this State, and holds receipt showing payment before the first day of February preceding such election. The Legislature provided in article 5048 of the Revised Civil Statutes that "There shall be levied and collected from every male person between the ages of twenty-one and sixty years, resident within this State, on the first day of January of each year (Indians not taxed, and persons insane, blind, deaf and dumb or those who have lost one hand or foot, excepted), an annual poll tax of one dollar and fifty

Vol. 54 Crim.—19.

cents, one dollar for the benefit of free schools, and fifty cents for general revenue purposes." Section 83 of the Act of 1905 further exempts from this poll tax all officers and enlisted men of the active militia of this State who comply with their military duties as prescribed by this Act, except the poll tax prescribed by the Constitution for the support of the public schools. Section 6 of what is known as the Terrell election law also provides that every male person who is more than sixty years of age, or who is blind, deaf or dumb, or who is permanently disabled or has lost one hand or foot shall be entitled to vote without being required to pay a poll tax if he obtains his certificate of exemption from the county collector when the same is required by the provisions of this Act.

Now, before proceeding further, I will notice the question of classification. In regard to the right of suffrage, the Constitution does not classify those who have a right to vote, nor is there any exemption in the Constitution from payment of poll tax of those who have the right to vote. Article 6 of that instrument enumerates those who can not vote, reserving the right to vote in all other citizens of Texas. The amendment to this article a few years ago requires that all voters as a prerequisite to exercising the elective franchise shall pay their poll tax, and exempts no voter from its provisions. The payment of the poll tax on or before the first of February preceding the election at which he proposes to cast his vote is a prerequisite from every voter. It will be noticed that under article 8, section 1, of the Constitution, the Legislature has the power to levy a poll tax. Under article 7 that tax is made obligatory upon all male inhabitants of Texas between twenty-one and sixty years of age. Under the terms of that clause of the Constitution citizenship is not a requisite. It applies as well to the alien. It also applies to those who are unable to vote as set forth in article 6 as well as to those who can, but it is nevertheless a poll tax, and the voter must pay it, for there are no exemptions. Section 2 of article 8 of the Constitution authorizes the imposition of occupation taxes and expressly authorizes the Legislature to classify, but this classification has reference only to *occupation taxes; it does not apply to poll taxes.* There is nothing justifying the idea of classification in regard to poll taxes within the terms of the Constitution. All voters must pay, else forfeit the right of voting. The militiamen, nor the deaf and dumb, nor the blind, nor the cripple, nor the disabled, nor any one else can avoid paying this poll tax under the terms of the Constitution, and under article 6 in order to become a voter the poll tax must be paid on or before the first of February and a receipt taken, which receipt is a prerequisite to his voting. Therefore, it will be observed that the question with reference to classification has no relation to or bearing upon the question of paying poll tax, nor does it apply to the right of suffrage. Where class legislation is interdicted by the Constitution, statutory class legislation is necessarily void. The Terrell election

law is equally obnoxious to article 8, section 1, which requires that all taxes shall be equal and uniform, and in regard to poll taxes demanded of those entitled to vote, it must be equal and uniform. They are all in one class. They can not be divided into classes. In fact I do not understand the Legislature has undertaken to classify, but only to exempt from the operation of the poll tax law something like a dozen classes of citizenship. This is not classification, but exemption, for which there is no warrant. Poll tax is what is termed in the law books "Capitation Tax" and is a tax. "A poll tax or a tax upon the person simply without any reference to his property, real or personal, or to any business in which he may be engaged, or to any employment which he may follow" is a capitation tax. See 6 Cyclopedia of Law and Procedure, page 349; Gardner v. Hall, 61 N. C., 21; Hylton v. U. S., 3 Dall. U. S., 171-175; 1 Lawyers' Ed., 556; The Head Money Cases, 21 Blatchf. (U. S.), 460; 18 Fed. Rep., 135-139. A poll tax is under all the authorities a tax. 27 Am. & Eng. Ency. of Law, p. 634; Cooley on Taxation, p. 18. In Texas it is made to bear equally upon all male residents, from twenty-one to sixty years of age, and all those who are entitled to vote. See constitutional provisions heretofore cited. If every citizen in Texas, under the terms of the Constitution, who is entitled to vote, is required to pay a poll tax, it is evident there can be no classification, because every voter is necessarily in one and the same class. Under the Constitution none are exempted; in the statute quite a number are exempted. I feel safe in making the assertion that no authority will be found which authorizes the Legislature to detract from or add to the qualifications of voters as set forth in the Constitution. There has been a great deal written on very refined lines seeking to draw a distinction in regard to suffrage as to whether it is a *privilege* or a *right*. With that matter I have no very great concern at present. But I would like to ask from whom do Texans obtain their rights or privileges anyway, and who confers these rights and privileges? It may be called a *right* or a *privilege*, but whenever and wherever it is guaranteed by the Constitution and the status of the voter is fixed by that instrument it becomes as sacred to the voter, and to the people who ordained the Constitution as any right in that instrument, and doubtless more sacred, for it is here the power of the people is lodged and exercised. That the great body of the people in ordaining the Constitution could have made different provisions is conceded, but when they have been fixed in the Constitution, then such conditions become absolutely unassailable, and beyond the power of the Legislature to change in any respect by adding to or detracting from such conditions. Our Constitution has fixed this status. The Legislature has sought to change it. The Constitution exempts none who are entitled to vote from payment of the poll tax, but in fact in a very mandatory manner commands that payment be made as a pre-

requisite to his *privilege* or *right* to vote, and this being true, the Legislature is powerless to change it in any manner whatever. Whenever the Constitution has fixed the status of a voter, whether it be a *privilege* or a *right,* it is as sacred as is his right of trial by jury, or that he shall not be tried for a felony except upon an indictment found by a grand jury, or that he shall not be placed twice in jeopardy of life or liberty for the same offense, or any other of the reserved rights. Nor do I care to enter into a discussion as to whether these rights of any character specified in the Constitution are *inherent* or *otherwise.* Whenever they are *specified* in the *Constitution* they become *sacred* and *unassailable* by any department of the government, legislative, judicial or executive. Therefore, I am not concerned so particularly as to what it may be called, *"right"* or *"privilege."* The difference is one of refined abstruse reasoning. The decisions and elementary works speak of it as a *"right"* or *"privilege,"* either or both, and in fact use the two words, *"right"* and *"privilege,"* rather indiscriminately. In State v. Staten, 6 Coldw., Tenn., 233, it was said: "The elective franchise is a right which the law protects and enforces as jealously as it does property in chattels or lands. It matters not by what name it is designated—the right to vote, the elective franchise, or the privilege of the elective franchise; the person who, under the Constitution and laws of the State, is entitled to it, has a property in it which the law maintains and vindicates as vigorously as it does any right of any kind which men may have and enjoy. The rules of law which guard against deprivation or injury, the rights of persons in corporeal properties, are alike and equally applicable to the elective franchise, and alike and equally guard persons invested with it against deprivation of or injury to it. Persons invested with it can not be deprived of it otherwise than by 'due process of law.' To the same extent that persons can not be deprived of their lands and chattels, or rights and franchises of any kind, otherwise than by due process of law, is it also true that without 'due process of law' they can not be deprived or divested of the muniments which evidence and establish their titles and rights, such as deeds, bills of sale, bonds, promissory notes, and the like; and the certificate of registration and the right to vote may be properly included in the category." Again, the doctrine is without qualification or contradiction of authority, so far as I am aware, that, "where the right of suffrage is fixed by the Constitution of a State, as is the case in most States, it can be restricted or changed by an amendment to the Constitution or by an amendment to the Federal Constitution, such as would be binding upon the States. But it can not be restricted or changed in any other way. The Legislature can pass no law directly or indirectly either restricting or extending the right of suffrage as fixed by the Constitution." See 10 Am. & Eng. Ency. of Law, p. 573; State v. Adams, 2 Stew. (Ala.), 239; Rison v. Farr, 24 Ark.,

161; 87 Am. Dec., 52; Eaton v. Brown, 96 Cal., 371; 31 Am. Dec. Rep., 225; Spier v. Baker, 52 Pac. Rep., 659; County Ct. v. People, 58 Ill., 456; People v. English, 139 Ill., 622; Quinn v. State, 35 Ind., 485; 9 Am. Rep., 754; Kinneen v. Wells, 144 Mich., 497; 59 Am. Rep., 105; People v. Maynard, 15 Mich., 471; State v. Fitzgerald, 37 Minn., 26; State v. Findlay, 20 Nev., 198; Allison v. Blake, 57 N. J. L., 6; Allison v. Public Road Board, 58 N. J. L., 140; Lanning v. Carpenter, 20 N. Y., 447; Green v. Shumway, 39 N. Y., 418; People v. McDonald, 52 N. Y. Supp., 898; Van Bokkelen v. Canaday, 73 N. Car., 198; Page v. Allen, 58 Pa. St., 338; 98 Am. Dec., 272; McCafferty v. Guyer, 59 Pa. St., 109; Bredin's Appeal, 109 Pa. St., 337; Lyman v. Martin, 2 Utah, 136; Bloomer v. Todd, 3 Wash. Ter., 599; State v. Williams, 5 Wis., 308. "While the elective franchise is a privilege rather than a right and may be taken away by the power which conferred it, yet when it has been granted by the Constitution it can not be abridged by the Legislature, and all laws in regulation of the same must be reasonable, uniform and impartial. Where the Constitution of a State fixes the qualifications and determines who shall be deemed qualified voters in direct, positive and affirmative terms, these qualifications can not be added to by legislative enactment. Any provisions which would impose upon a particular class of citizens conditions and requirements not imposed upon all others are void. Neither is it within the power of the Legislature to dispense with any of the constitutional qualifications and confer the elective franchise upon other classes than those to whom it is given by the Constitution; for the enlargement and deprivation of the right of suffrage are equally obnoxious to the Constitution. In short it is not within the power of the Legislature to deny, abridge or extend the constitutional right of suffrage; or in any way to change the qualifications of voters as defined by the Constitution of the State." This quotation is from the 15th vol. of Cyc. of Law and Procedure, at pages 281 and 282. The supporting authorities are as follows: Monroe v. Collins, 17 Ohio St., 665; In re Newport Charter, 14 R. I., 655; In re Appointment of Supervisors, 52 Fed., 254. That the Legislature has no power thus to disfranchise voters who are qualified by the terms of the Constitution see authorities already cited, and in addition see State v. Tuttle, 53 Wis., 45; 9 N. W., 791; State v. Lean, 9 Wis., 279; State v. Williams, 5 Wis., 308; 68 Am. Dec., 65; 18 Cent. Dig. tit. "Elections," sec. 2, et seq.; Spier v. Baker, 120 Cal., 370; 52 Pac. 659; 41 L. R. A., 196; People v. English, 139 Ill., 622; 29 N. E., 678; 15 L. R. A., 131; State v. Findlay, 20 Nev., 198; 19 Pac., 241; 19 Am. St. Rep., 346; State v. Dillon, 32 Fla., 545; 14 So., 383; 32 L. R. A., 124; Gougar v. Timberlake, 148 Ind., 281; 25 N. E., 221; 9 L. R. A., 326; Coffin v Board of Election Com'rs., 97 Mich., 188; 56 N. W., 567; 21 L. R. A., 662; State v. Board of Examiners, 21 Nev., 67; 24 Pac., 614; 9 L. R. A., 385; Clayton v.

Harris, 7 Nev., 64; Davies v. McKeeby, 5 Nev., 369; Allison v. Blake, 57 N. J. L., 6; 29 Atl., 417; 25 L. R. A., 480; Cusick's Election, 136 Pa. St., 459; 20 Atl., 574; 10 L. R. A., 228; 18 Cent. Dig. tit. "Elections," sec. 6, et seq. Nor can the Legislature change the qualification as fixed by the Constitution. See Black's Constitutional Law, p. 538; Cooley Const. Lim., p. 79, and note, and page 752. Mr. Black says: "Where the Constitution of a State, as is usually the case, fixes the qualifications of those who are to enjoy the right of suffrage, it is the intention that the standards so set up shall remain unalterable until the popular will changes to such an extent as to involve an alteration of the organic law. In this case, it is not within the constitutional power of the State Legislature to alter, modify, or dispense with the qualifications determined by the Constitution. It is not lawful to enact statutes which would either exclude persons admitted by the Constitution, or admit persons whom the Constitution would shut out. No new or different qualifications can be prescribed, nor can any of those named by the Constitution be abrogated." See Chase v. Miller, 41 Pa. St., 403; McCafferty v. Guyer, supra; State v. Adams, supra; Bourland v. Hildreth, 26 Cal., 161. Mr. Cooley, page 752 of his work on Constitutional Limitation, says: "In another place we have said that, though the sovereignty is in the people, as a practical fact it resides in those persons who by the Constitution of the State are permitted to exercise the elective franchise," citing Ex parte Siebold, 100 U. S., 371; Ex parte Clarke, 100 U. S., 399; In re Coy, 127 U. S., 731; United States v. Goldman, 3 Woods, 187. On page 78 Mr. Cooley further says: "Where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effectual or convenient. The rule applies to the exercise of power by all departments and all officers. * * * Another rule of construction is, that when the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases." In note 2, to the above, Mr. Cooley adds, on page 79 of his work, a great number of authorities, some of which have already been cited. See also St. Joseph et al. v. R. R. Co. Buchanan County Court, 39 Mo., 485; State v. Symonds, 57 Me., 148; State v. Staten, 6 Cold., 233; Randolph v. Good, 3 W. Va., 551. And a great number of authorities mentioned in the note support the proposition that "The Legislature can not add to the constitutional qualifications of voters." It has further been said that "A constitutional designation of the qualifications for the exercise of specific rights is not subject to legislative modification. Thus, it is not competent for the Legislature to add to the constitutional qualifications of voters nor change the qualifications of public officers as prescribed by the Constitution." In support of these propositions the text cites

the decisions cited supra. This extract is from 6 Am. & Eng. Ency. of Law, p. 28. In Am. & Eng. Ency. of Law, pp. 576-7, the following language is found: "If there is no provision in the Constitution as to the qualifications of voters, the Legislature may fix them. But if the qualifications of voters are fixed by the Constitution, as is the case in most States, the Legislature has no power to restrict the right of suffrage by further or different qualifications. Nor can the Legislature extend the right of suffrage to those not possessed of the constitutional qualifications, for the grant of the right to certain classes is by implication a restriction to those classes." In support of these propositions, in addition to the authorities already cited, the foot notes cite a great many others, among which I mention Brewer v. McClelland, 32 N. E. Rep., 299; Attorney-General v. Detroit, 78 Mich., 545; 18 Am. St. Rep., 458; Bew v. State, 71 Miss., 1; Com. v. Reeder, 171 Pa. St., 505; Pearson v. Brunswick, 91 Va., 322; Barker v. People, 20 Johns., N. Y., 457; Gotchens v. Matheson, 58 Barb. N. Y., 152; Huber v. Reily, 53 Pa. St., 112; People v. Blodgett, 13 Mich., 127; Chase v. Miller, 41 Pa. St., 403; People v. English, 139 Ill., 622. In State v. Dillon, 32 Fla., 586, it was held that an act which required the voter to pay his own poll tax did not deprive him of the right to pay it by agent, and the Terrell election law expressly recognizes this right under circumstances mentioned in section 16 of that act as not being subject to punishment. The proposition may be again thus stated; when the Constitution makes specific provisions or declarations of powers on any particular subject, it is not within the power of the Legislature to enlarge or abridge the same. Any attempt in either direction will be plain usurpation and void. Gemmer v. State, 66 L. R. A., 82; State v. Askew, 2 S. W., 349; People v. Bull, 46 N. Y., 57; 7 Am. Rep., 302; Com. v. Gamble, 62 Pa. St., 343; State v. Thomas, 10 Kan., 191; State v. Wiltz, 11 La. Ann., 439; 10 Am. & Eng. Ency. Law, p. 681 (2 ed.); Howard v. State, 10 Ind., 99; Deweese v. State, 10 Ind., 343; Markle v. Wright, 13 Ind., 549; Cooley Const. Lim., 64.

It would seem, if a question could be settled at all uniformly and harmoniously, that the one under discussion has been so settled in the United States, and this by every court of last resort which has written on the subject. It would hardly be questioned that one of three propositions is inevitably correct; either that the Legislature has more power than the Constitution and is clothed with greater authority, and can with impunity add to or detract from the constitutional mandatory provisions, or the Constitution itself must be supreme; second, that those who pay the poll tax have a greater burden imposed upon them as a pre-requisite qualification for voting than do those who vote without paying said poll tax; third, that those who are exempted from payment of the poll tax are either disqualified as voters and not authorized to vote, or exercise the

elective franchise without being required to pay the poll tax and are, therefore, placed upon a different plane than those who do pay or are required to do so. Then, it may be incontestably stated that all those within the exemptions mentioned in the statute are either *disqualified* from voting, or they have a *"right"* or *"privilege"* conferred to *exercise* the *elective franchise without paying poll tax,* which the other citizenship of the State, who are voters, are required to pay. It is asserted in our bill of rights that all power is inherent in the people. That inherent power is asserted by express command of the Constitution through the elective franchise "by ballot." While sovereignty is in the people generally, the practical fact of sovereignty resides in that part of our people who are constitutionally authorized to exercise the elective franchise. It is only through the ballot box that the resident inherent power of our people is manifested in ordaining and executing and carrying on our republican form of government. These practical facts and propositions are beyond doubt or casuistry. Whether the elective franchise be "privilege" or "right," it is beyond question the embodied idea of inherent power in our citizenship. In it is the basic principle of constitutional government and sovereignty of the State. It is the essence, spirit and real life of our representative democracy. To attack it at any point as fixed by the Constitution would be plain usurpation. The rule of legislative omnipotence must find its termination in an attack on this inherent resident power in our constitutional elective franchise. The servant is not greater than his master. At the ballot box our inherent power is exercised, and as the Constitution has ordained it, that power must unalterably remain. It is by this means our officers are selected. It is through this method that many of our local laws and policies are vitalized and put into operation. It is the only way by which our Constitution can be amended, or a new one substituted. It is only through the elective franchise that *inherent power* finds expression. It would be a bold assertion to make that our legislative department could abrogate or modify the inherent power reserved by and resident in our people. If any or all departments could successfully emasculate this inherent power of our people, then our republican form of government would be at an end, and our boasted representative democracy a fiction. No department has any right or power to subordinate this inherent power. Much less would the power exist for legislative classification of those exercising the elective franchise. Suffrage is not an occupation and not subject to classification as are occupation taxes. The cases cited by my brethren in regard to occupation taxes have no pertinence or bearing on the elective franchise. Poll taxes are not occupation taxes. The elective franchise is not an occupation. As before stated, the Legislature is without power to classify voters from poll tax standpoint, because the constitutional provisions are mandatory and delegate no such authority to that body, nor do they

grant power to make exemptions. When a citizen proposes in Texas to exercise the right of elective franchise, he must comply with the provisions of the Constitution, and when he has done so he is safe from legislative interference from this standpoint.

I am not unaware of the consequences of holding an act of the Legislature unconstitutional in regard to these exemptions, nor am I unmindful of the far-reaching consequences if the propositions asserted were successfully maintained in their effect upon what is known as the Terrell election law. I understand full well that the police power of a State is very comprehensive and far-reaching, but I as fully understand that no power, police or otherwise, assumed by legislative, judicial or executive departments of the government is sufficiently comprehensive to set aside, override or annul the plain or mandatory provisions of the Constitution. To attempt to do so would be usurpation of power. Nor can the doctrine of inconvenience obtain in questions of this character. As was said in Chance v. Marion County, 64 Ill., 66. "In construing the language of the Constitution the courts have nothing to do with the argument from inconvenience. Their sole duty is to declare it a lex scripta est." Greencastle Tp. v. Black, 5 Ind., 571; People v. Morrell, 21 Wend., N. Y., 584; Newell v. People, 7 N. Y., 109. "When the terms of a written Constitution are clear and unambiguous, and have a well understood meaning and application, effect must be given to the intent of its framers as indicated by the language employed. The operation and effect of the instrument will not be extended by construction beyond the fair scope of the terms employed, merely because the more restricted and literal interpretation might be inconvenient or impolitic, or because a case may be supposed to be to some extent within the reasons which led to the introduction of some particular provision, plain and precise in its terms. Settle v. Van Evrea, 49 N. Y., 280." So far as the writer is concerned, it has been regarded as a duty to follow the Constitution as it is written without reference to results and regardless of consequences. If the Constitution does not work as it is thought it should, the same power which ordained can change it either by substituting a new one, or by amending the provisions found to be objectionable. The fact that the provisions of the Constitution may work inconvenience or hardship in this or that case, or under this circumstance or under other conditions, is a matter which has had no effect upon my action in construing and upholding that instrument as written. The hardship may be endured until it can be changed or amended by the same power that ordained it, and when the courts or the Legislature, or the executive, or all three combined, assume or exercise power to divert it from its plain meaning and evident purpose and intent, a dangerous precedent has been set and a principle inaugurated that can at will overturn any other and all other provisions of that instrument. From this doctrine I have always withheld

my assent, and will continue to raise my voice against it while clothed with judicial authority. The doctrine of inconvenience or convenience leads inevitably to the ultimate destruction of constitutional government, which would be legalized anarchy.

For the reasons indicated, I respectfully enter my dissent from the conclusion reached by my brethren. I believe the law under discussion, under which the appellant was convicted, is unconstitutional and in plain violation of the organic law.